WILLIAM MAGILL AND JOYCE MAGILL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MALAG TUBE SPECIALTIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1519–76, 1520–76.    Filed June 21, 1978.

*D. Alden Newland,* for the petitioners.
*Daniel J. Westerbeck,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases respondent determined deficiencies in Federal income tax and additions to tax as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax under sec. 6651(a)[1] | sec. 6653(a) |
|---|---|---|---|---|---|
| 1519–76 | William Magill and Joyce Magill | 1970 | $5,356.23 | --- | --- |
| | | 1971 | 63,190.84 | --- | $3,159.54 |
| | | 1972 | 15,019.50 | --- | 750.98 |
| 1520–76 | Malag Tube Specialties, Inc. | 1971 | 22,816.83 | $5,704.21 | --- |

Mutual concessions have resolved a number of issues, leaving these questions to be decided:

### Docket No. 1519–76

(1) Whether income from discharge of indebtedness is excludable from petitioners' 1971 gross income under sections 108 and 1017. (Petitioners do not contest that the indebtedness was discharged giving rise to income.)

(2) In the alternative, whether the indebtedness was assumed pursuant to a section 351 transaction.

(3) Whether certain travel and entertainment expenses incurred by William Magill but paid by Malag Tube Specialties, Inc., constitute taxable income to petitioners under section 61(a).

(4) Whether any part of petitioners' underpayment of tax for 1971 and 1972 was due to negligence or intentional disregard of rules and regulations under the provisions of section 6653(a).

### Docket No. 1520–76

(5) Whether Malag Tube Specialties, Inc., failed to file its 1971 corporate income tax return and is liable for the addition to tax provided in section 6651(a).

### FINDINGS OF FACT

### Docket No. 1519–76

Petitioners William and Joyce Magill (docket No. 1519–76) resided in Bloomfield Hills, Mich., when their petition was filed. They filed joint income tax returns for the years 1970, 1971, and 1972 with the Internal Revenue Service Center at Covington, Ky.

Until December 31, 1960, William Magill was a partner in a

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.

firm called Malag Tube Specialties. Magill acquired the interests of his partners on December 31, 1960, and thereafter operated Malag Tube Specialties as a sole proprietorship (the proprietorship).

On December 27, 1963, William Magill organized Abbott Tube, Inc. (Abbott), and acquired 50.02 percent of the corporate stock. Joyce Magill, his wife, acquired the remaining 49.98 percent of the stock. Thereafter, William Magill became president of Abbott. Abbott fabricated custom tubing and sold all its output to the proprietorship. The proprietorship then sold the tubing to the ultimate users of the products in automobile and defense industries. Both Abbott and the proprietorship used the accrual method of accounting from their inceptions until 1970. During the course of its operations the proprietorship became indebted to Abbott for tubing it had acquired from Abbott. The proprietorship carried its liabilities to Abbott as accounts payable. As of December 31, 1969, the proprietorship's records reflected an account payable to Abbott of $118,683.04. Abbott's records reflected a corresponding account receivable in the same amount.

On January 1, 1970, William Magill liquidated the proprietorship and transferred all of its assets to Abbott for their book values, totaling $53,596.36. Abbott then changed its name to Malag Tube Specialties, Inc. (Malag). The assets identified as being transferred in the bill of sale were machinery and equipment, office equipment, and accounts receivable. Goodwill was not mentioned as an asset of the proprietorship in the bill of sale nor was it reflected on the books and records of the proprietorship, Abbott, or Malag. The bill of sale did not list any liabilities being transferred.

The books and records of both the proprietorship and Malag were incomplete, confusing, and not kept in accordance with generally accepted accounting principles. This confusion was compounded by changes in bookkeepers, return preparers, and accountants. From 1968–73 the Magills and Malag retained the following as bookkeepers, return preparers, or accountants for personal and corporate income tax matters:

(a) Ted Kustryk kept the books for 1968.

(b) Robert Henry, CPA, of Arthur Young & Co., prepared the 1968 and 1969 returns. Agnes Brush, a relative, was the bookkeeper for the corporation during 1969.

(c) Gullett, Fox & Boyer, an accounting firm in Southfield, Mich., kept the books for 1971 and prepared the 1970 income tax returns.

(d) Hy Ankerman prepared the 1971 individual income tax return and was retained to prepare the 1971 corporate income tax return. He also kept the books for 1972.

(e) Norman J. Stricof, CPA, and his firm, Stricof & Polk, CPAs, prepared the 1972 returns for the individuals and the corporation and maintained the books for 1973.

Malag elected to be treated as a subchapter S corporation on January 1, 1970, but terminated that election at the conclusion of that year. It was a subchapter S corporation for 1970. Malag used the accrual method of accounting for 1970, 1971, and 1972.

Malag's beginning balance sheet retained the $118,634.04 as an account receivable from the proprietorship (William Magill). On January 1, 1970, Malag's accountant at the time, Robert Henry, CPA, a member of the Arthur Young & Co. firm, offset the $118,683.04 debt of William Magill to Malag against the $53,596.36 debt (accounts payable) owed by Malag to Magill for the proprietorship assets and arrived at a net account payable by Magill to Malag of $65,086.68.

Malag carried the $65,086.68 on its books as "note receivable, officers" throughout 1970. As a result of various credits owed by Malag to William Magill, his debt to Malag (the corporation's "note receivable, officers") was reduced to $64,571.49 on Malag's books as of December 31, 1970.

Malag retained the accounting firm of Gullett, Fox & Boyer to keep its books during 1970 and 1971.[2] Wayne Boyer, a member of that firm, prepared a corporate balance sheet as of February 28, 1971, that reflected a "note receivable, officers" of $64,571.49. During 1971, Malag made disbursements of $23,300 in addition to salary payments to William Magill. Malag added the disbursements to Magill's existing indebtedness to the corporation ("note receivable, officers") of $64,571.49, resulting in a "note receivable, officers" of $87,871.49 as of December 31, 1971. As of that date Malag's trial balance sheet and corporate books showed a "note receivable, officers" due from Magill of $87,871.49. Gullett, Fox & Boyer had also prepared an interim

---

[2]This was stipulated but may be inconsistent with the listing of bookkeepers above, also stipulated, which states that Gullett, Fox & Boyer kept the books for 1971 and prepared the return for 1970. Mr. Boyer was called as a witness but was not asked to clear up this possible inconsistency.

corporate balance sheet on September 30, 1971, that reflected cumulative disbursements of $13,800 as of that date by Malag to Magill.

Sometime during 1971, $53,596.36 was restored to the books of Malag as an account payable to William Magill. On its books Malag then reduced the $53,596.36 by the $23,300 it had disbursed to Magill during 1971. Malag then showed a net account payable of $30,296.36. These adjustments were not in accordance with standard accounting practices or generally accepted accounting principles.

Hy Ankerman kept Malag's books from January 1972 through January 1973. He prepared an unexecuted copy of a 1971 corporate income tax return for Magill. On this return he eliminated the $87,871.49 "note receivable, officers" account and reduced the corporate capital account accordingly. Ankerman relied on a worksheet as a basis for this reduction, but who prepared this worksheet is unknown. The unexecuted corporate tax return for 1971, prepared by Ankerman, indicated that the liability from Magill to Malag had been eliminated.

Magill did not include the $87,871.49 in his income for 1971 or any subsequent year.

The Magills and Malag retained Norman Stricof, CPA, by February of 1973 as their accountant for individual and corporate matters. Stricof acquired knowledge of Malag's forgiveness of the indebtedness of William Magill and of the underlying entries in the books and records when Stricof obtained a copy of a purported 1971 corporate income tax return and Malag's books and records in January of 1973. Stricof immediately recognized that elimination of the receivable with no explanation might give rise to a dividend to Magill. His inquiries to the previous preparers, bookkeepers, and accountants revealed no additional facts as to what had actually happened and why the various book entries had been made.

By September 24, 1973, Stricof had examined the books and records of the Magills and Malag, had questioned the taxpayers, the previous bookkeepers, preparers, and accountants, and had reviewed the purported 1971 corporate income tax return. He then proceeded to prepare and execute Malag's 1972 corporate income tax return.

Stricof and his associates acquired enough knowledge about the transaction to attempt to reverse the various entries on the

books and records of Malag. Michael Malek, a member of Stricof's firm, by a journal entry made September 10, 1973, but dated December 31, 1972, returned the $30,296.36 (which Malag had been carrying as an account payable to William Magill) to retained earnings (surplus) retroactive to January 1, 1972. Malek then debited retained earnings $87,871.49 and credited "note receivable, officers" $87,871.49 to adjust the existing trial balances.

The District Director of Internal Revenue, Detroit, Mich., sent the petitioners William and Joyce Magill a notice of deficiency for the taxable years 1970, 1971, and 1972 on December 19, 1975.

Petitioners first notified respondent of their intention to request an exclusion from gross income for discharge of indebtedness and to adjust basis pursuant to sections 108 and 1017 on February 26, 1976, when they filed their petition with the Court. Also, petitioners requested an adjustment to basis in a conference with respondent on April 1, 1976, but did not file a request for basis adjustment at that time.

On March 14, 1977, 2 days before this case was called for trial, petitioners William and Joyce Magill filed an amended individual income tax return (Form 1040X) for their 1971 taxable year and a Consent of Taxpayer to Adjustment of Basis of Property Under Section 1017 of the Internal Revenue Code (Form 982), and related documents, with the Director of the Internal Revenue Service, Cincinnati, Ohio. An attachment to Form 982, in general terms, requested adjustments to basis as of January 1, 1976, rather than January 1, 1971, conditioned on a determination that there was a discharge of indebtedness for 1971. The properties to which the adjustments were to be made were not identified.

Throughout 1971 and 1972 Malag paid for many of William Magill's meals and for entertainment. On most of these occasions Magill would be buying food and drinks for people with whom Malag did business, as well as for himself.

On their 1972 return, petitioners failed to report as income $21,000 in salary received from Malag.

*Docket No. 1520–76*

Petitioner Malag Tube Specialties, Inc. (Malag) (docket No. 1520–76), had its principal place of business in Troy, Mich., when its petition was filed. Malag filed corporate income tax returns

for the years 1970 and 1972 with the Internal Revenue Service Center at Covington, Ky.

A request for an extension of time for filing the 1971 Malag corporate income tax return was made on March 17, 1972.

On April 1, 1974, the Internal Revenue Service at Covington, Ky., received an unexecuted copy of the purported 1971 corporate income tax return for Malag. On April 11, 1974, the District Director of Internal Revenue in Detroit, Mich., received an unexecuted copy of the purported 1971 corporate income tax return. The District Director forwarded that document to the Internal Revenue Service Center at Covington, Ky. These unexecuted copies (signed by Hy Ankerman as preparer but without signature of an officer or representative of Malag) are incomplete. The Schedule M–1 (Reconciliation of Income Per Books with Income Per Return) and Schedule M–2 (Analysis of Unappropriated Retained Earnings Per Books) are blank.

On January 14, 1977, respondent requested that the director of the Internal Revenue Service Center, Covington, Ky., search the records in his custody and possession for Malag's 1971 corporate income tax return. These records were searched under Malag's correct employer identification number (38–1735420) and under an incorrect number (38–1734520). The Director of the Internal Revenue Service Center at Covington, Ky., has no record of Malag's filing a corporate income tax return for 1971.

Magill's statements regarding filing of Malag's 1971 corporate income tax return have been as follows: On November 3, 1973, Magill told Revenue Agent Shalhoub that he did not recall whether the 1971 Malag return had been filed. In response to an October 9, 1974, request for a written explanation of Malag's delinquency Magill wrote a letter to Shaloub, stating that the return had been filed on or before March 15, 1972, and that "Mr. Ankerman was to expedite the prompt and timely delivery to Internal Revenue. If such was not done, we hereby request waiver of any penalty as we believe there to be due cause beyond our reasonable control." In 1977 Magill informed his attorney, in response to respondent's interrogatory, that he and Joyce Magill had mailed the return from Southfield, Mich., after picking it up in Ankerman's office there. Finally, at trial, Magill testified that he did not sign the return in Ankerman's office and did not mail it from there. Instead, he stated that he picked it up in Hamtramck, Mich., took it home and signed it in the presence of

his wife, and then he and his wife took it to the main post office in Detroit to mail it to make sure it was mailed on time.

ULTIMATE FINDINGS OF FACT

*Docket No. 1519–76*

No reasonable cause exists for the Magill's untimely request under sections 108 and 1017.

Part of petitioners' underpayment of tax for 1971 and 1972 was due to negligence or intentional disregard of rules and regulations.

*Docket No. 1520–76*

Malag did not file a complete and executed corporate income tax return for 1971 and no reasonable cause exists for its failure to do so.

OPINION

*Docket No. 1519–76*

The principal issues in this docket relate to discharge of indebtedness income. Prior to 1970 William Magill, as a sole proprietor in the business of selling custom tubing, became indebted in the amount of $118,683.04 to Abbott, a corporation owned by William and Joyce Magill, for tubing acquired on credit. On January 1, 1970, William Magill liquidated the proprietorship and transferred its assets to Abbott and changed the corporation's name to Malag. The proprietorship conveyed all of its assets to Malag for their book value of $53,596.36. According to the bill of sale and the parties' books, no goodwill was transferred as part of the sale. As a result of a credit for the proprietorship assets transferred, the $118,683.04 liability owed by Magill to Malag was reduced to $65,086.68. Other amounts owed by Malag to Magill further reduced this amount to $64,571.49 as of December 31, 1970. Malag carried Magill's debt on its books throughout 1970. During 1971 Malag loaned additional funds to Magill raising his debt to the corporation to $87,871.49. At sometime during 1971 this debt from Magill to

Malag was eliminated from the books and/or records of Malag although the amount thereof was not paid by Magill.[3]

By notice of deficiency, respondent determined that sometime in 1971 the $87,871.49 debt was discharged, a fact conceded by petitioners on brief. As such, it is income included in gross income under section 61(a), particularly section 61(a)(12), unless there is an exclusion to the contrary. Petitioners also concede this on brief. At issue is whether section 108 applies here to provide such an exclusion.

Section 108 excludes the income by reason of the discharge of indebtedness if two conditions are met. First for an individual, the indebtedness must have been incurred or assumed "in connection with property used in his trade or business." This requirement is satisfied here with respect to all but $23,300 of the debt discharged. Since $64,571.49 of the debt represented accounts payable incurred by William Magill to purchase tubing he sold as a sole proprietor, that amount complies with the statute. See sec. 1.108(a)–1(a)(2), Income Tax Regs.; Rev. Rul. 76–86, 1976–1 C.B. 37. However, the facts before us do not reveal why $23,300 was disbursed by Malag to William Magill during 1971. In view of petitioners' burden of proof, see Rule 142, Tax Court Rules of Practice and Procedure, $23,300 of the discharge of indebtedness fails the first requirement for exclusion under section 108.

The second requirement under section 108 is that the taxpayer must make and file "a consent to the regulations prescribed under section 1017[4] (relating to adjustment of basis) then in

---

[3]The record is unclear and confusing as to how or why the $87,871.49 indebtedness of Magill to Malag was "eliminated" in 1971. However, respondent determined that the indebtedness was forgiven in 1971 and petitioners had the burden of proving error in that determination, which they admittedly could not do. Petitioners' opening brief (p. 22) recognizes that "For reasons which are not clear and cannot be established, sometime in 1971 the $87,871.49 debt was eliminated, and the corporate capital account was reduced accordingly." Consequently we do not consider whether the indebtedness was forgiven in 1971 to be an issue in this case, and petitioners do not argue to the contrary; instead they direct their arguments primarily to exclusion of the amount from Magill's income by virtue of the relief provisions of secs. 108 and 1017.

[4]SEC. 1017. DISCHARGE OF INDEBTEDNESS.

Where any amount is excluded from gross income under section 108(a) (relating to income from discharge of indebtedness) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 108(a)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Secretary or his delegate) in effect at the time of the filing of the consent by the taxpayer referred to in section 108(a). The reduction shall be made as of the first day

effect at such time and in such manner as the Secretary or his delegate by regulation prescribes."

Pursuant to this statutory authority, section 1.108(a)–2, Income Tax Regs., provides that to take advantage of the exclusion a taxpayer generally must file with his return for the taxable year a consent to have the basis of his property adjusted in accordance with the regulations prescribed under section 1017. No such consent was filed with the Magills' original return for 1971, but petitioners claim their delinquent consent is sufficient under this exception:

In special cases, however, where the taxpayer establishes to the satisfaction of the Commissioner reasonable cause for failure to file the necessary consent with his original return, he may file the consent with an amended return or claim for credit or refund; and in such cases, the consent shall be to the regulations which, at the time of filing the consent, are applicable to the taxable year for which such consent is filed. In all cases the consent shall be made by or on behalf of the taxpayer on Form 982 in accordance with these regulations and the instructions on the form or issued therewith. [Sec. 1.108(a)–2, Income Tax Regs.]

Petitioners have not established to the satisfaction of the Commissioner that reasonable cause existed for their failure to file the necessary consent with the original return. In view of the legislative delegation of authority to promulgate regulations on making and filing a consent under section 108, the issue is narrowed to whether the Commissioner has abused the broad discretion granted him by rejecting petitioners' delinquent consent. *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244, 1250–1251 (2d Cir. 1973).

---

of the taxable year in which the discharge occurred, except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.

Sec. 1.1017–1, Income Tax Regs., provides the manner and order in which the adjustments to the basis of property of the taxpayer shall be made. The adjustments are not limited to property used in taxpayer's trade or business; they may eventually be applied to inventories and other property of the taxpayer.

Sec. 1.1017–2, Income Tax Regs., provides that in special cases the adjustments to basis of taxpayer's property may be made in a manner different than set forth in sec. 1.1017–1, Income Tax Regs., upon a proper showing to the satisfaction of the Commissioner. A request for variations from the general rule must be filed with the return for the taxable year in which the discharge of indebtedness occurred unless a consent is permitted under sec. 108 after the original return is filed. Agreement as to any variations must be made by a closing agreement. If no agreement is reached as to variations, then the consent filed on Form 982 shall be deemed a consent to application of the general rules unless taxpayer specifically disavows application of the general rules. In that event secs. 108 and 1017 shall not apply.

Petitioners' Form 982 election was filed with an amended return on March 14, 1977, 2 days before this case was called for trial, and almost 5 years delinquent. As reasonable cause for their late filing, petitioners point primarily to their confusion surrounding the tax treatment of discharge of indebtedness income. That is, they urge that not being aware of the provisions of sections 108 and 1017 nor of the need to file an election to obtain relief under those sections justifies their delinquency. They attribute this ignorance of the law to William Magill's lack of sophistication in tax matters and to the incompetence and confusion caused by a parade of accountants, bookkeepers, and preparers who handled their personal and corporate affairs.

Guidance on what constitutes reasonable cause is provided in *Columbia Gas System, Inc. v. United States, supra.* There the taxpayer asserted the existence of reasonable cause for a delinquent consent to reduce basis in that at the time of the filing of its original returns it was unaware of the possibility that it might be deemed to have realized income from the discharge of indebtedness upon conversion of its debentures. The Court of Appeals rejected this contention where the taxpayer was "at all times fully aware of all of the material facts of the transaction." 473 F.2d at 1251. Cf. *Denman Tire & Rubber Co. v. Commissioner*, 192 F.2d 261 (6th Cir. 1951), affg. 14 T.C. 706 (1950) (under section 108's predecessor, taxpayer not permitted to file late election where it was fully cognizant of all the facts at the time of filing its original return). The court reasoned that it was unlikely that reasonable cause was meant to be so broad as to encompass a claim "based at worst upon mere hindsight or at best upon an unexpected ruling by the Commissioner." 473 F.2d at 1251.

Petitioners' most compelling argument in attempting to distinguish *Columbia Gas* is that they did not even know that the debt had been forgiven until long after the fact. However, it stretches credulity to say that William and Joyce Magill were so lacking in knowledge of this corporate-shareholder transaction. They were the sole shareholders of Malag, and William was Malag's president. Elimination of the $87,871.49 corporate receivable he owed the corporation could hardly escape their attention. That the books and records were confused does not change this fact. Accountants and bookkeepers do not authorize discharge of corporate indebtedness; they merely record transac-

tions that have occurred. Moreover, petitioners' accountants certainly knew of the discharge of indebtedness in eliminating it in Malag's books and records. Since we have found that petitioners were aware of the material facts, *Columbia Gas* is not meaningfully distinguishable.

In any event, we cannot say that the Commissioner abused his discretion in rejecting an election 5 years delinquent. We doubt that Congress intended a taxpayer to have the benefit of 5 years' hindsight in determining whether to elect to exclude discharge of indebtedness income. Compare *Goldring v. Commissioner*, 20 T.C. 79, 83 (1953) (dealing with the Commissioner's discretion to reject an amended return). Petitioners' accountant who prepared the unexecuted 1971 return for Malag knew that the indebtedness had been eliminated when he prepared the return on March 15, 1972. Petitioners' present accountant realized that the indebtedness had been discharged which might give rise to income as early as 1973 when he received the books and records of Malag and a copy of the purported 1971 return. We cannot believe this was not brought to Magill's attention at that time. Even after the petition was filed herein (February 1976) requesting relief under section 108, no Form 982 was filed until March 1977.[5] And, the Form 982 that was filed was out of date (the form used was a 1963 Form 982; it was revised in 1967). As such, it did not contain the information (for example, a description of the properties to receive basis adjustments and a designation of the basis before and after reduction) the Commissioner needs to grant a consent. Rather than proposing which properties would be adjusted, petitioners wanted to negotiate basis adjustments. Finally, petitioners' consent to adjustment of basis was qualified by a request to have basis adjusted as of January 6, 1976, rather than January 1, 1971. Before this Court petitioners even seek to postpone the basis adjustments to whenever this case is decided. Section 1017, however, requires the reduction in 1971,[6] which further suggests that the Commissioner acted reasonably in refusing to readjust income and bases over a 5-year period. Rejection of such a tardy

---

[5] At trial, counsel for petitioners claimed he had given counsel for respondent a copy of the Form 982 in the summer of 1976. No testimony or evidence was submitted to support this claim, and this hardly constitutes an election in any event.

[6] Sec. 1017 provides: "The reduction shall be made as of the first day of the taxable year in which the discharge occurred, except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began."

and qualified election is a proper exercise of administrative discretion.

To summarize, $23,300 of the income from discharge of indebtedness is not excluded under section 108 because that portion of the debt was not shown to have been incurred or assumed in connection with property used in petitioners' trade or business. And all the income from discharge of indebtedness fails the additional section 108 condition that the taxpayer make and file a consent to the regulations prescribed under section 1017 at such time and in such manner as the Secretary or his delegate by regulations has prescribed.

Whether respondent's characterization of the discharge of indebtedness income as a "dividend" is correct has no effect on the deficiency asserted, and we need not consider it.

As an alternative argument petitioners urge that "in essence" all the events from January 1, 1970 through 1971, should be collapsed as part of an exchange of proprietorship assets for stock. Petitioners' apparent motive for this argument is that they claim the recognized gain would be limited under sections 351(b) and 357(c) to $88,337.67[7] of which 10 percent is said to be allocable to ordinary assets and 90 percent to goodwill and equipment. As a result they contend that 10 percent of the gain would be ordinary income and 90 percent capital gain.

The most obvious answer to this contention is that the transaction whereby the proprietorship transferred its assets to Malag was not structured as a transfer in exchange for stock; it was structured as a sale of assets for cash. Furthermore, Magill did not receive any stock and immediately after the transaction he did not own control of Malag as required under section 351. He owned only 50.2 percent of the stock rather than the 80 percent required under section 368(c). Petitioners' reliance upon *King v. United States*, 79 F.2d 453 (4th Cir. 1935) (failure to issue stock to sole shareholder not fatal)[8] is misplaced because Magill's receipt of additional stock would have changed his interest in the corporation, and his failure to do so was not inconsequential. Furthermore, it is clear that the indebtedness of Magill to Malag was not considered a part of the transaction. The transfer

---

[7] Petitioners compute the gain as follows: Debt of $118,634.04 minus basis of assets transferred $53,596.37, or $65,037.67, see sec. 357(c), plus cash boot in 1971 of $23,300, see sec. 351(b).

[8] The Court in *King v. United States*, 79 F.2d 453 (4th Cir. 1935), treated the shareholder who owned all but 2 out of 1,000 shares of the corporation as a sole shareholder.

occurred on June 1, 1970, and the indebtedness was not eliminated until sometime in 1971.

We reject as unfounded and irrelevant, in light of petitioners' acknowledgment elsewhere in their brief that the indebtedness was forgiven in 1971, petitioners' suggestion that the proprietorship exchanged goodwill, somehow overlooked in the bill of sale, for its indebtedness to Malag. There is no evidence, other than Magill's unsupported and self-serving testimony, that the proprietorship had goodwill to transfer or the value thereof.

The next issue is whether William Magill derived gross income in 1971 and 1972 from certain expenditures for travel and entertainment paid by Malag on his behalf. For the years 1971 and 1972 Malag incurred American Express charges of $3,444.08 and $3,371.15, which respondent has determined personally benefited William Magill and were taxable to him as dividends.[9]

The evidence before us on this question is sketchy at best. Apparently the American Express charges were primarily for "business" lunches and dinners at which William Magill (sometimes joined by Joyce Magill) entertained automobile company executives. William Magill offered only cursory testimony in this respect and generally denied personal benefit.

In the absence of a specific exemption, the expenditures for food and drink consumed by petitioners themselves were income within the meaning of section 61(a).[10] Since Malag's expenditures were in lieu of what the Magills would have spent for their meals, they received an economic benefit the value of which is includable in their income. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); *Patterson v. Thomas*, 289 F.2d 108 (5th Cir. 1961), cert. denied 368 U.S. 837 (1961), rehearing denied 370 U.S. 966 (1962). No specific exemption has been brought to our attention to modify this conclusion. See *Commissioner v. Kowalski*, 434 U.S. 77 (1977). We might reach a different conclusion with respect to the amounts charged to Malag for food and entertainment for business guests of Magill if we had any evidence on which to base an allocation. We accept Magill's

---

[9]Again, we do not find it necessary to determine whether any gross income was taxable as dividends. William Magill was president and principal shareholder of Malag and we need not consider whether any income was compensation for services or constructive distributions with respect to his stock. The parties stipulated that the items were not deductible by Malag and their characterization as salary or dividends here is immaterial.

[10]Sec. 61(a) provides that "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived."

testimony that many of these guests were customers of Malag and were fed and entertained in a business context. However, we have no evidence upon which we could base an allocation nor any breakdown of the expenditures. Since petitioners had the burden of proving that the expenditures were not taxable income to them, we must sustain respondent's determination on this issue. No deductions with respect to these items are in issue and the effect on petitioners' taxable income is as respondent determined.

The final issue in this docket is whether the Magills were negligent in the preparation and execution of their income tax returns for 1971 and 1972. Section 6653(a) imposes a 5-percent addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations (but without intent to defraud). Respondent's determination that part of the deficiency for each year was due to negligence is prima facie correct. Petitioners have the burden of rebutting this presumption by showing that they used due care. *Leroy Jewelry Co. v. Commissioner*, 36 T.C. 443, 445 (1961). Rule 142, Tax Court Rules of Practice and Procedure. This petitioners have failed to do.

Indeed, the evidence is pursuasive that the Magills were negligent in the preparation and execution of their 1971 and 1972 returns. Most notably, the Magills neglected to report the $87,871.49 in discharge of indebtedness income in 1971 and $21,000 in salary payments for 1972. The salary omission was conceded by stipulation of the parties. Also stipulated were omissions of interest income in 1971 and 1972 and certain dividends in the form of airfare and flower expenditures for 1971 and 1972. In addition, William Magill admitted at trial that he did not read the returns for 1971 and 1972.

Petitioners attribute their failure to report these items to their reliance upon accountants to prepare their tax returns. Judging from the evidence before us, however, the omissions of income appear to be due to petitioners' failure to furnish their accountants with all pertinent data rather than good faith reliance on advice of a competent tax expert. Under these circumstances, a taxpayer cannot escape his duty of filing an accurate return by placing responsibility upon an agent. *Leroy Jewelry Co. v. Commissioner, supra.* Even if all data is furnished to the preparer, the taxpayer still has a duty to read the return

and make sure all income items are included. *Bailey v. Commissioner,* 21 T.C. 678, 687 (1954). In our opinion, petitioners were negligent within the meaning of section 6653(a) for 1971 and 1972, and the additions to tax were properly imposed.

### *Docket No. 1520–76*

The single issue in this docket is whether under section 6651(a)(1) Malag failed to file its 1971 corporate income tax return and is liable for the addition to tax for such failure.[11]

Section 6651(a)(1) imposes an addition to tax of 5 percent per month (up to 25 percent) for failure to file required returns on or before the filing due date (determined with regard to any extension of time for filing). Petitioner may avoid the delinquency addition to tax by making an affirmative showing that it filed a sufficient return on time, or that its failure to file timely was due to reasonable cause and not to willful neglect.

Respondent conducted a diligent search of his records under both correct and an incorrect employer identification numbers that were claimed to have been used, and there is no record of a filing of any 1971 corporate income tax return. However, respondent's records show a request for extension of time to file the return was received on March 17, 1972, and incomplete and unsigned 1971 returns were received in 1974.

The problem of proof of filing is troublesome. Claims of filing are easily fabricated, and yet it is possible that some returns are lost before being recorded by respondent. The credibility of those claiming a return was filed is often important.

William Magill testified that on March 15, 1972, he went to Hy Ankerman's office in Hamtramck, Mich., and picked up Malag's 1971 return. According to his testimony, he took the return to his home, signed it in the presence of his wife, made sure that there was postage on it, took the return downtown to the general post office in Detroit, Mich., and mailed it on the night of March 15, 1972, prior to 12 midnight. Joyce Magill corroborated her husband's testimony.

However, this testimony conflicts with William Magill's earlier statements. Initially, he told Revenue Agent Shalhoub that the return had been mailed. In response to Shalhoub's

---

[11]Petitioner also suggests that error was made in computing the addition to tax in the notice of deficiency. If needed, we will consider this point in reviewing the Rule 155 computation.

request for a written explanation, Magill's letter alleged that it was Ankerman's responsibility to see that the return was properly filed. Subsequently, responding to respondent's interrogatories, it was alleged that the return was mailed from an office in Southfield, Mich. On the witness stand Magill alleged that he mailed the return himself in downtown Detroit. These conflicting statements raise doubts about the credibility of Magill's testimony.

Also, the request for extension of time for filing and the incomplete and unsigned 1971 returns, all received by respondent after the March 15, 1972, due date for the 1971 returns, are inconsistent with petitioners' version of events and suggest that a completed and executed return was not timely filed.

Petitioners further suggest that respondent's allowance of a $206 credit against Malag's 1972 tax for overpayment of 1971 taxes supports its argument that the return for 1971 was timely filed. We do not draw the same inference that petitioners attach to this fact. Allowance of the credit, as reported on the 1972 return, probably just shows that respondent accepted Malag's assertion that it was entitled to such a credit.

We have found that Malag did not timely file a corporate income tax return for 1971, and there is no indication that its failure to do so is due to reasonable cause and not to willful neglect. If we were to believe the Magills' testimony on the witness stand, they were solely responsible for filing the return on time and they offered no excuse for failing to do so. On the other hand, if we were to believe Magill's written explanation to Shalhoub, it was Ankerman's responsibility to file the return on time. But this would not help petitioners; it is well established that a taxpayer cannot avoid liability for the delinquency addition to tax by relying on his agent to file the return on time. *Elliott v. Commissioner*, 40 T.C. 304 (1963). Accordingly, petitioner is liable for the addition to tax under section 6651(a).

*Decisions will be entered under Rule 155.*