NISHAN NAHIKIAN AND CAROLYN NAHIKIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nahikian v. Commissioner
Docket Nos. 18382-92, 2092-93
United States Tax Court
T.C. Memo 1995-161; 1995 Tax Ct. Memo LEXIS 156; 69 T.C.M. (CCH) 2370; April 10, 1995, Filed *156 Decision will be entered under Rule 155. For petitioners: Peter T. Beach and David F. Conley. For respondent: Christine Colley. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: Docket No. 18382-92: Sec.
Sec.
Sec.
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(1)(A)
1987
$ 32,715
--
--  $ 1,636
1988
30,559
--
$ 1,528
--  Sec.
Sec.
Sec.
Year
6653(a)(1)(B)
6661
6662(a)
1987
[1]
$ 8,179
--
1988
--
7,640
--
Docket No. 2092-93: Sec.
Sec.
Sec.
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(1)(A)
1990
$ 9,525
$ 480
--
--
Sec.
Sec.
Sec.
Year
6653(a)(1)(B)
6661
6662(a)
1990
--
--
$ 1,905
After concessions by the parties, the issues for decision are: (1) Whether Nishan Nahikian (petitioner) received taxable distributions from his wholly owned corporation during the calendar years in issue. We hold that he did. (2) Whether petitioners are liable for an addition to tax for failure to file timely their *157 individual income tax return pursuant to section 6651(a) for the year 1990. Petitioners conceded this issue on brief. (3) Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a)(1)(A) and (B) for the 1987 tax year, section 6653(a)(1) for the 1988 tax year, and section 6662(a) for the 1990 tax year. We hold that they are. (4) Whether petitioners are liable for an addition to tax for a substantial understatement of income tax pursuant to section 6661 for 1987 and 1988. We hold that they are. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT These cases are consolidated for trial, briefing, and opinion. Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts and attached exhibits. Petitioners are husband and wife and resided in Hooksett, New Hampshire, at the time they filed their petitions. Petitioner is an engineer and also has a degree in economics. Carolyn Nahikian (Mrs. Nahikian) has a bachelor of arts degree in English *158 education and, at the time of trial, was on leave from a master's program in business administration. Petitioners operate a construction company, Nahikian Enterprises and Works, Inc. (NEW). Petitioner is the sole shareholder of NEW and Newstress International, Inc. (Newstress). Newstress manufactures prestressed concrete and fabricates superinsulated panels for sale to third parties, including NEW. NEW integrates prestressed concrete with superinsulated panels in both residential and commercial construction projects. Mrs. Nahikian served as office manager for both NEW and Newstress. She performed clerical and administrative duties for both companies which included "controlling document flow" to the bookkeeper. NEW built a single-family home (the Hooksett house) for petitioners, which petitioners occupied as their personal residence. Prior to moving into the Hooksett house, petitioners resided in a townhouse in northern New England. NEW constructed the Hooksett house with prestressed concrete and superinsulated panels. Although prestressed concrete was not typically employed in residental construction, petitioner explored the use of prestressed concrete in combination with *159 superinsulated panels instead of the more common wood frame construction. Construction of the Hooksett house began in 1986 and continued through each of the taxable years in issue. NEW supplied the funds, materials, and labor for construction and incurred the following costs: $ 13,629.09 for "work performed in 1986", $ 184,524.53 for the fiscal year ended March 31, 1988, and $ 60,693.73 for the fiscal year ended March 31, 1989. There was no evidence of construction costs incurred during NEW's fiscal year ended March 31, 1987. Petitioners moved into the Hooksett house in July 1988, even though construction was not yet complete. A partial list of uncompleted items included the following: The house lacked exterior siding; there were no stairs up to the front porch; the interior lacked carpeting and finished floors in the kitchen; the kitchen appliances and a shower in one of the bathrooms had not been installed; and there was no landscaping. Petitioners received cash advances from NEW. These cash advances and various repayments are summarized below: Advance Date
Repayment
Balance $ 6,000.00
May 2, 1986
$ 6,000.00
14,000.00 Sept. 2, 1986
20,000.00
10,000.00
Sept. 12, 1986
30,000.00
5,009.00
Sept. 25, 1986
35,009.00
9,003.00
Oct. 1, 1986
44,012.00
15,268.91
Nov. 13, 1986
59,280.91
Dec. 29, 1986
$ 25,855.00
33,425.91
5,926.22
Mar. 2, 1987
39,352.13
28,500.47
May 11, 1987
67,852.60
July 30, 1987
10,000.00
57,852.60
Nov. 13, 1987
18,979.17
38,873.43
Jan. 7, 1988
18,000.00
20,873.43
Mar. 15, 1988
8,000.00
12,873.43
2,610.00
Aug. 1, 1988
15,483.43
3,000.00
Sept. 2, 1988
18,483.43
50,000.00
Sept. 29, 1988
68,483.43
5,000.00
Sept. 29, 1988
73,483.43
3,000.00
Dec. 8, 1988
76,483.43
5,000.00
Nov. 10, 1989
81,483.43
5,000.00
Mar. 29, 1990
86,483.43
*160 NEW advanced the funds by way of checks drawn on a NEW corporate account and signed by petitioner or Mrs. Nahikian. Petitioners applied none of the cash advances to construction costs on the Hooksett house. Petitioners made the repayments listed above with personal checks payable to NEW. Petitioner signed each check with the exception of the check dated January 7, 1988, which was signed by Mrs. Nahikian. A partially legible notation on the check dated December 29, 1986, reads "REPAYMENT [illegible] ACCOUNT". A notation on the check dated July 30, 1987, reads "REPAYMENT LOAN". A notation on the check dated January 7, 1988, reads "reduce adv. off." The "Loan to Officer" account on NEW's financial statements and corporate tax returns reflected the following: NEW FYE Mar. 31 Loan to officer 1987
$ 65,207
1988
172,507
1989
239,510
1990
280,877
1991
286,720
1992
150,000
In the fiscal year ended March 31, 1992, NEW reduced the Loan to Officer account by $ 136,720 and deducted this amount as a research and development expense. During the years in issue, NEW adjusted the Loan to Officer account at yearend and carried the yearend balance on its financial *161 statements and corporate returns. NEW maintained no subsidiary books or ledgers indicating the sources or breakdown of the Loan to Officer account or how the yearend adjustments were calculated. No interest accrued on the cash advances to petitioners or the Loan to Officer account. Petitioner executed no formal loan documents, such as notes, security agreements, or repayment schedules. NEW's corporate returns reflected the following cumulative retained earnings: NEW FYE Mar. 31 Retained earnings 1987
$ 29,220 1988
92,751 1989
415,207 1990
186,662 1991
(43,838)
NEW's corporate returns showed officer compensation, salaries, and wages as follows: NEW FYE Mar. 31 Officer compensation
Salaries and wages
1988
--
$ 55,239
1989
$ 105,500
--
1990
65,000
--
1991
--
8,754
NEW never declared or paid dividends. NEW's articles of incorporation contain no restrictions on the amount the corporation could advance to its shareholder, nor do the articles provide for a lien in favor of the corporation on its shares of stock for any debt or liability of its shareholder. Petitioners had average monthly accumulated savings and/or cash on hand *162 for each of the following years: 1986
$ 8,641
1987
22,693
1988
23,000
1989
30,466
1990
8,624
1991
37,269
1992
55,769
Respondent began the audit of NEW on March 6, 1990. As part of that audit, respondent's agents also examined the tax returns of Newstress. Petitioners' returns were also examined. OPINION Construction Costs of Personal Residence
Respondent determined that the additions to NEW's Loan to Officer account in each year before us constitute a corporate distribution for such years. Respondent calculated taxable distributions of $ 129,280 for 1987, $ 93,379 for 1988, and $ 41,367 for 1990. In so doing, respondent made adjustments for 1987 and 1988 to reflect NEW's March 31 fiscal year versus petitioners' calendar year. Respondent must also make this adjustment for 1990. Respondent's calculations separated the total distributions into taxable dividends to the extent of earnings and profits, return of capital to the extent of petitioner's remaining basis in the stock, and capital gain. Petitioners argue that an amount equal to the fair market value of the Hooksett house constitutes a loan while the balance of the Loan to Officer account *163 is a research and development expense incurred by NEW. In the alternative, petitioners argue that any taxable distribution is limited to the fair market value of the Hooksett house. Petitioners bear the burden of proving that respondent's determination is not correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit may become a constructive dividend taxable to the shareholder. Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980). A shareholder distribution is a loan, rather than a constructive dividend, if at the time of the disbursement the parties intended that it be repaid. Crowley v. Commissioner, 962 F.2d 1077, 1079 (1st Cir. 1992), affg. T.C. Memo. 1990-636. Mere declarations by shareholders that they intended a transaction to constitute a loan is insufficient if the transaction fails to meet more reliable indicia of debt which indicate the intrinsic economic nature of the transaction. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), *164 affg. T.C. Memo. 1978-306. Courts examine objective evidence of the parties' intentions including: (a) The taxpayer's degree of control over the corporation; (b) the existence of restrictions on the amount of disbursements; (c) the corporate earnings and dividend history; (d) the use of customary loan documentation, such as promissory notes, security agreements, or mortgages; (e) the ability of the shareholder to repay; (f) the treatment of the disbursements on the corporate records and financial statements; (g) the creation of legal obligations such as payment of interest, repayment schedules, and maturity dates; (h) whether the corporation undertook to enforce repayment; (i) the magnitude of the disbursements; (j) the repayment history; and (k) the eventual disposition of the corporate funds disbursed. Crowley v. Commissioner, supra at 1079; Lewis v. Commissioner, T.C. Memo. 1985-563. These factors are useful in determining whether there is a true intention to repay, but none of these factors is determinative. Alterman Foods, Inc. v. United States, 505 F.2d 873, 876-877 n.6 (5th Cir. 1974). *165 Respondent's deficiency determinations are derived from NEW's Loan to Officer account. Petitioners argue that the Loan to Officer account contains only the costs of constructing the Hooksett house. They treat the cash advances as a nonissue. Respondent contends that the Loan to Officer account contains both cash advances and construction costs. The confusion stems from the fact that petitioners failed to produce any subsidiary books or ledgers that accurately reflect the contents of the account.[1] We do not consider the distinction between cash advances and construction costs material in this case. Respondent determined that petitioners received taxable corporate distributions from NEW based on additions to the Loan to Officer account, however that account may have been calculated. The burden remains with petitioners to show that respondent's determination is not correct, regardless of whether the alleged distributions consisted of cash advances or funds expended in constructing petitioners' residence. See Achiro v. Commissioner, 77 T.C. 881, 890 (1981), and the cases cited therein. Thus, we focus our attention on the Loan to Officer account *166 and discuss the distinction between construction costs and cash advances where appropriate. Petitioner owns 100 percent of NEW's stock, and NEW's articles of incorporation contain no restrictions on the amount disbursed to its shareholder. NEW's corporate returns indicated retained earnings of $ 29,220 as of *167 March 31, 1987, $ 92,751 as of March 31, 1988, $ 415,207 as of March 31, 1989, and $ 186,662 as of March 31, 1990. NEW paid no dividends, and there is no indication that the retained earnings were needed in the business. Petitioners produced no documents that typically are used in loan transactions. Petitioners argue that the Loan to Officer account was secured by a mechanics lien on the Hooksett property; however, they offered no evidence showing the existence of a mechanics lien or that NEW took steps to perfect any such lien. Petitioners were not in a position to repay the funds advanced by NEW. In the years 1986-92, petitioners' average monthly accumulated savings ranged from a low of $ 8,641 in 1990 to a high of $ 55,769 in 1992. Mrs. Nahikian testified that when petitioners sought outside financing on the Hooksett property in March 1991, they were told that their salaries were insufficient to qualify for a loan. Petitioners argue that were it not for the distressed New England real estate market, they could have sold their townhouse in northern New England or mortgaged the Hooksett property in order to repay the alleged loans. Petitioners offered no evidence showing *168 the value of their townhouse, and the Hooksett house was a questionable source of repayment. Petitioners argue that the corporation's treatment of the amounts in issue as loans on its books and records constitutes evidence of an intent to repay the advances. This factor is not determinative without further evidence substantiating the existence of a bona fide loan. Thielking v. Commissioner, T.C. Memo. 1987-227, affd. without published opinion 855 F.2d 856 (8th Cir. 1988); Baird v. Commissioner, 25 T.C. 387, 395 (1955). Petitioners' books and records do not account accurately for the amounts in issue. NEW had a Loan to Officer account balance of $ 172,507 for its fiscal year ended March 31, 1988. NEW's records show $ 184,524.53 of construction costs on the Hooksett house for that fiscal year. For its fiscal year ended March 31, 1989, NEW had a Loan to Officer account balance of $ 239,510, an increase of $ 67,003 over the fiscal year ended in 1988. NEW's records show $ 60,693.73 of construction costs on the Hooksett house for the fiscal year ended March 31, 1989, which corresponds approximately *169 with the increase in the Loan to Officer account. However, petitioners have failed to account for $ 63,610 in cash advances made by NEW during its fiscal year ended March 31, 1989. NEW maintained no subsidiary books or ledgers and simply made a yearend adjustment in the Loan to Officer account, which reflects the $ 67,003 increase. Petitioners testified that they intended to repay the loans upon completion of the house and, therefore, the alleged loans contained both a repayment schedule and maturity date. Petitioner testified that he had no construction timetable, and that this was one of the reasons he did not obtain a construction loan. Thus, petitioners' contention that the completion date of the house was the loan maturity date merely begs the question since petitioner had set no completion date. No interest accrued on the alleged loans, and NEW never attempted to enforce repayment. The parties have not focused on the magnitude of the disbursements. Petitioners argue on brief that the Loan to Officer account contained only construction costs and that they made periodic repayments to the account. Petitioners contend that they made repayments of $ 80,834.17 ($ 25,855 + *170 $ 10,000 + $ 18,979.17 + $ 18,000 + $ 8,000) to the Loan to Officer account, [2] and that these repayments illustrate their true intent to treat the account balances as loans. The repayments do not support petitioners' argument that the additions to the Loan to Officer account balances constitute loans. The repayment pattern and testimony at trial support the conclusion that the repayments applied to the cash advances and not to the construction costs. Petitioners testified that they intended to repay the construction costs after construction was complete. Petitioners also testified that the Hooksett house was not complete when they moved in. Yet, the last payment was made on March 15, 1988, nearly 4 months before petitioners moved into the Hooksett house. Petitioners' testimony indicates that repayment on the Hooksett house construction costs would not have taken place prior to the date petitioners *171 moved into the residence. Since the repayments should first be applied to the cash advances and then to the construction costs, we conclude that the repayments did not reduce the accrued construction costs. Petitioners made the last repayment on March 15, 1988. As of that date, the total cash advanced to petitioners exceeded the total repayments. Thus, these alleged repayments could not have reduced the accrued costs of construction. In addition, testimony as to the specific repayments does not support petitioners' contention that the Loan to Officer account balances constitute loans. As noted above, petitioners produced no subsidiary books or ledgers that indicate where these repayments were posted. Petitioner testified that he did not personally tell his accountant whether repayments were made on the Loan to Officer account. Mrs. Nahikian testified that some, but not all, of the repayments were recorded on the corporate books and records. Had petitioners intended the repayments to reduce the outstanding Loan to Officer balance, we believe they would or should have been more diligent in seeing that the amounts were recorded properly. Petitioners' last repayment argument *172 focuses on a personal check dated December 29, 1992, for $ 90,000 written from petitioners' bank account to NEW. Petitioners testified that they received the $ 90,000 when they mortgaged the Hooksett property. At trial, petitioners produced a copy of the face of the $ 90,000 check. Nothing on the face of the check indicates that it had been processed upon deposit. Petitioners did not produce a copy of the back of the check. Respondent produced a bank record showing a $ 90,000 deposit into a NEW corporate account on December 30, 1992. On December 31, 1992, a check was drawn on the NEW account in the amount of $ 90,000. Respondent also produced a $ 90,000 check dated December 30, 1992, written on the NEW corporate account and made payable to Newstress International, Inc. Petitioner's memory was vague when pressed by respondent's counsel as to why the alleged repayment went to NEW and then apparently to Newstress. We are not convinced that the $ 90,000 check produced at trial ever was paid to NEW. Even if petitioners paid the $ 90,000 to NEW, there is no evidence that the $ 90,000 was for repayment of the Loan to Officer account. Petitioners' other arguments as to the disposition *173 of the amounts in issue relate to NEW's reasons for constructing the Hooksett house. These arguments focus on whether there was a corporate purpose for the distributions. Petitioners direct our attention to the factors set forth in Helgesen Properties, Inc. v. Commissioner, T.C. Memo. 1983-771. In Helgesen, this Court considered whether a shareholder intended to repay his corporation for construction done on his behalf. The factors from Helgesen include: (1) Whether the shareholder in fact paid any of the costs during or upon completion of construction; (2) whether the project costs were treated in the same manner as the costs for projects built for others; (3) whether the shareholder attempted to conceal records of project costs; and (4) whether the construction contract essentially provided that the corporation is to bear the costs. We already have found that petitioners did not pay any of the construction costs. As to the second factor, petitioner testified that his company built a duplex for an employee in 1984 or 1985. The employee apparently paid for the materials, and the company paid all other costs. With respect to the Hooksett *174 house, petitioner testified that he intended to reimburse his wholly owned corporation for "the fair market value" of the house. Petitioners did not attempt to conceal records of project costs. No construction contract existed between petitioners and NEW. From this scant evidence we cannot conclude that petitioners treated the project costs for their personal residence in the same manner as the costs for projects built for others. We sustain respondent's determination that the amounts credited to the Loan to Officer account for the years in issue constitute taxable distributions. Amount of the Taxable Distribution
Petitioners next argue, in the alternative, that the taxable distribution received from NEW, if any, is limited to the fair market value of the Hooksett house. Petitioner testified that his wholly owned corporation constructed the Hooksett house for three reasons: (1) To retain employees trained in the use of prestressed concrete, superinsulated panels, and steel stud partitions; (2) to develop construction techniques and to conduct research using prestressed concrete and superinsulated panels for residential construction; and (3) to provide a house for petitioner *175 and his family. Petitioners reason that because NEW had a substantial business purpose for constructing the Hooksett house, the construction costs should be allocated between corporate and personal expenditures. Petitioners argue that the taxable distribution is limited to the fair market value of the property they received. Where substantial business and personal motives relate to the corporate expenditure, an allocation between the two is required. International Artists, Ltd. v. Commissioner, 55 T.C. 94, 105 (1970). We conclude that petitioners have proffered no substantial evidence of a business motive upon which this Court can make such an allocation. We do not accept petitioners' argument that NEW constructed the Hooksett house in order to retain employees. NEW's corporate returns indicate that $ 55,239 in wages was paid during its fiscal year ended March 31, 1988. We have no evidence that associates these wages with construction of the Hooksett house. We also have no evidence as to the number or identity of NEW's employees who worked on the Hooksett house. NEW's corporate tax returns reported no employee wages in the fiscal years ended *176 March 1989 and March 1990. Petitioners have failed to establish that retaining employees was a substantial business motive. Petitioners argue that constructing the Hooksett house provided NEW with unique construction knowledge and that the construction costs that exceed the fair market value of the house constitute research and development expenditures. Petitioner testified as to the problems encountered during construction and the unique design issues associated with the use of prestressed concrete for residential construction. However, respondent's expert pointed out that a builder would not necessarily need to construct a house in order to gain knowledge in the use of prestressed concrete because much of this research had been done and data was currently available in design publications. In its fiscal year ended March 31, 1992, NEW reduced the Loan to Officer account balance by $ 136,720 and took a deduction in that amount, which purportedly reflected the research and development portion of the Hooksett house. We attach little probative value to this adjustment since petitioner provided no basis or backup for the amount. Furthermore, the writeoff occurred more than a year *177 after commencement of respondent's audit. We conclude that petitioners did not consider the Hooksett house a research and development project at the time that NEW constructed the house. We hold that the additions to NEW's Loan to Officer account in each year in issue, as determined by respondent, constituted taxable distributions to petitioners. Additions to Tax
Section 6651 Addition to Tax for Failure To File Return
Respondent determined an addition to tax under section 6651 asserting that petitioners failed to file timely a 1990 Federal income tax return. Petitioners concede that, if a deficiency exists for their 1990 tax year, then the addition to tax pursuant to section 6651(a) (1) will apply. Additions to Tax for Negligence
Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1)(A) and (B) for their 1987 taxable year, section 6653(a)(1) for their 1988 taxable year, and section 6662(a) for their 1990 taxable year. For 1987, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(1)(B) imposes an addition *178 to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. For 1990, section 6662(a) imposes an addition to tax equal to 20 percent of the portion of the underpayment which is attributable to negligence. Negligence is defined as the lack of due care or the failure to do what a prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of establishing that the negligence addition to tax does not apply. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioners contend that they reasonably relied on their accountant to prepare their Federal income tax returns for 1987, 1988, and 1990. Generally, the duty of filing accurate returns cannot be avoided by placing responsibility *179 on an agent. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). However, in some cases, taxpayers may avoid the addition to tax for negligence if they have furnished all the relevant information to a tax preparer and relied on that person's professional advice as to the proper tax treatment. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982). Even when all relevant information is furnished to the preparer, the taxpayer still has a duty to read the return and make sure all income items are included. Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981). Petitioners testified that their accountant was aware of the operation of the business, but they did not testify as to specific information that they provided to the accountant concerning the Loan to Officer account. Petitioner purchased a computer *180 software bookkeeping system and tailored that system to meet NEW's bookkeeping requirements. Petitioner then asked his accountant for comments and suggestions, but petitioner did not state who recommended or created the Loan to Officer account. Petitioner did not discuss with the accountant the construction of the Hooksett house or the proper book treatment of the expenses associated therewith. Nor did petitioner tell the accountant that payments were made on the Loan to Officer account. We find that petitioners did not provide all relevant information to their accountant, nor did they rely on their accountant's tax advice. Accordingly, we sustain respondent's determination with respect to petitioners' liability for the additions to tax for negligence. Section 6661 Substantial Understatement Addition to Tax
Respondent determined an addition to tax under section 6661 for each of the tax years 1987 and 1988. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement exists where the amount of tax shown on the taxpayer's return is less than the amount required *181 to be shown on his or her return. Sec. 6661(b)(2)(A). In the case of individuals, an understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by items with respect to which the taxpayer had substantial authority for his or her position or for which relevant facts affecting the tax treatment were adequately disclosed. Sec. 6661(b)(2)(B). Petitioners bear the burden of showing that they are not subject to this addition to tax determined by respondent. Rule 142(a). Petitioners argue that substantial authority supports their position. Substantial authority exists for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions. Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); Cramer v. Commissioner, 101 T.C. 225, 255 (1993); sec. 1.6661-3(b), Income Tax Regs. In light of our discussion above, we conclude that the *182 authorities relied on by petitioners did not constitute substantial authority for their position, and that the relevant facts affecting the tax treatment were not disclosed at all, let alone adequately. Accordingly, petitioners are liable for an addition to tax under section 6661 for each of the tax years 1987 and 1988. To reflect the foregoing and the concessions by the parties,
Decisions will be entered under Rule 155.
Footnotes
1. 50 percent of the interest due on $ 32,715.↩
1. At trial petitioners sought to introduce a document (Exh. 14-N(1)) in evidence that appears to be an accountant's workpaper of the NEW Loan to Officer account. The document was admitted into evidence, but we conclude that it should be afforded very little weight. Petitioners' accountant did not prepare the document. Petitioners' accountant testified that the handwriting appeared to be that of another accountant who now works for petitioners' accountant. The other accountant did not, however, work for petitioners' accountant when the document was prepared. There are no initials or dates on the document, and petitioners' accountant could only speculate as to the source of the information on the document.↩
2. This calculation does not include the alleged $ 90,000 repayment made on Dec. 29, 1992, which we discuss below.↩