T.C. Memo. 2012-21

UNITED STATES TAX COURT

JOHN P. OWEN AND LAURA L. HASKELL OWEN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.    930-07,  1384-07,    Filed January 19, 2012.
               13303-07, 29011-08,
               29090-08.


        R determined deficiencies in Ps' income tax on the
basis of his disallowance of the individual Ps' assignment
of income to their personal service corporation.  R also
determined that Ps were liable for sec. 6663, I.R.C., fraud
penalties, or, in the alternative, sec. 6662(a) accuracy-
related penalties.

        <u>Held</u>:  Ps are liable for portions of the deficiencies
and sec. 6662(a) accuracy-related penalties in accordance
with this opinion.

---

        [1]Cases of the following petitioners are consolidated here-
with:  J and L Owen, Inc., docket No. 1384-07; J & L Gems, Inc.,
docket No. 13303-07; John Owen and Laura L. Haskell Owen, docket
No. 29011-08; and J & L Owen, Inc., docket No. 29090-08.

Cruz Saavedra and James E. Pratt, for petitioners.

Shirley D. Chin and Scott W. Mentink, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined the following deficiencies and penalties with respect to the Federal income tax of (1) John P. and Laura L. Haskell Owen (the Owens), (2) J & L Owen, Inc. (J&L Owen), and (3) J & L Gems, Inc. (J&L Gems):[2]

| Petitioners | Year | Deficiency | Penalty Sec. 6663 |
|---|---|---|---|
| John P. and Laura L. Haskell Owen | 2002 | $1,499,732 | $1,113,271.50 |
| | 2003 | 657,118 | 492,838.50 |
| | 2005 | 116,623 | --- |

| Petitioner | TYE July 31 | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|---|
| J & L Owen, Inc. | 2003 | $160,791 | $32,158 |
| | 2005 | 49,729 | --- |

| Petitioner | TYE July 31 | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|---|
| J & L Gems, Inc. | 2003 | $3,520 | $704 |

---

[2]All section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. As an alternative to the sec. 6663 civil fraud penalty in the event the Court decides it does not apply, respondent determined a sec. 6662(a) accuracy-related penalty for both the Owens' 2002 and 2003 tax years.

After concessions by petitioners and respondent,[3] the issues left for decision are:

_____

[3]Respondent concedes the sec. 6663 civil fraud penalties he determined against the Owens for the 2002 and 2003 tax years but not the sec. 6662(a) accuracy-related penalties for these 2 tax years.  Respondent concedes an adjustment to income of $27,074 for commissions and fees for Oxford Life proposed against the Owens for their 2002 tax year.  Respondent concedes that the Owens reported $89,770 and $618,434 from Family First Advanced Estate Planning (FFAEP), originally paid to J&L Owen, in their taxable income in 2002, although respondent maintains that the Owens improperly assigned these payments.  The Owens concede that they incorrectly reported $82,630 of interest income as capital gain for their 2002 taxable year.  The Owens concede that they failed to include $1,500,000 of capital gain in income for their 2003 taxable year.  The Owens concede that they failed to include in income a State of California tax refund of $1,360 for their 2005 taxable year.

Respondent and petitioners concede all material issues with respect to J&L Owen consistent with the stipulation of settled issues filed on May 17, 2010, incorporated herein.  Petitioners concede that J&L Owen is liable for a sec. 6662(a) accuracy-related penalty for the tax year ending July 31, 2003, and that J&L Gems is liable for a sec. 6662(a) accuracy-related penalty for the tax year ending July 31, 2003, consistent with the stipulation of settled issues.  Respondent did not determine a sec. 6662(a) penalty for J&L Owen's tax year ending July 31, 2005; however, petitioners also conceded a penalty for that year, and on brief respondent seems to assume that the sec. 6662(a) penalty for the tax year ended July 31, 2003, is still at issue.  We accept petitioners' concession for the tax year ending July 31, 2003, and note that there was no penalty to concede for the tax year ended July 31, 2005.

We note that respondent took protective alternative positions in the notices of deficiency; however, after the issues were defined for trial, respondent did not address many of the protective positions at trial or on brief, and we deem them conceded.  See, e.g., Rule 151(e)(4) and (5); Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  We also note that consistent with the findings in this opinion, the protective positions are no longer necessary.

(1) Whether the Owens failed to include $100,000 in income from American Investor Life for the 2002 tax year;

(2) whether the Owens overreported their income by $910,454 for the 2002 tax year;

(3) whether the Owens failed to include $75,000 in income from American Investor Life for the 2003 tax year;

(4) whether the Owens failed to include a management incentive bonus of $322,375.27 from Family First Insurance Services in income for the 2003 tax year;

(5) whether the Owens failed to include commission income of $40,070.86 from Family First Insurance Services for the 2003 tax year;

(6) whether the Owens failed to include an employment termination payment from Amerus of $350,000 in their income for the 2005 tax year;

(7) whether the Owens are entitled to defer $1,867,500 of capital gain from the sale of their stock in Family First Advanced Estate Planning (FFAEP) under section 1045(a); and

(8) whether the Owens are liable for the section 6662(a) accuracy-related penalties for the 2002 and 2003 tax years.

## Summary of Concessions[4]

| Petitioners | Taxable Year | Category | Notice of Deficiency Adjustment | Respondent's Concessions | Petitioners' Concessions |
|---|---|---|---|---|---|
| John P. and Laura L. Haskell Owen | 2002 | Oxford Life income | $27,074 | $27,074 | --- |
| | | FFAEP income | 89,770 | 89,770 | --- |
| | | Family First payments | 618,434 | 618,434 | --- |
| | | Interest income | 82,630 | --- | $82,630 |
| | 2003 | Capital gain | 1,500,000 | --- | 1,500,000 |
| | 2005 | Cal. tax refund | 1,360 | --- | 1,360 |
| Total | | | 2,319,268 | 735,278 | 1,583,990 |

| Petitioner | TYE July 31 | Category | Notice of Deficiency Adjustment | Respondent's Concessions | Petitioners' Concessions |
|---|---|---|---|---|---|
| J & L Owen, Inc. | 2003 | Compensation of officers | $190,000 | $190,000 | --- |
| | | Taxes and licenses | 15,251 | 14,652 | $599 |
| | | Pension, profit sharing | 226,902 | 113,451 | 113,451 |
| | | Employee benefit | 5,418 | --- | 5,418 |
| | | Other deductions | 64,896 | 5,270 | 59,627 |
| | | Interest expense | 115 | 115 | --- |
| | | Depreciation expense | 2,474 | 2,474 | --- |
| | 2005 | Other deductions | 22,007 | --- | 22,007 |
| | | Pension | 77,600 | 38,800 | 38,800 |
| | | NOL deduction | 24,715 | --- | 24,715 |
| Total | | | 629,378 | 364,762 | 264,617 |

---

[4]This summary does not include concessions of penalties. All values have been rounded to the nearest whole dollar.

| Petitioner | TYE July 31 | Category | Notice of Deficiency Adjustment | Respondent's Concessions | Petitioners' Concessions |
|---|---|---|---|---|---|
| J & L Gems, Inc. | 2003 | Other deductions | $14,077 | $2,004 | $12,073 |
| | | Cost of goods sold | 10,973 | --- | 10,973 |
| Total | | | 25,050 | 2,004 | 23,046 |

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and the accompanying exhibits are hereby incorporated by reference into our findings. At the time they filed their respective Tax Court petitions, all individual petitioners resided in California and all corporate petitioners maintained their principal place of business in California.

John and Laura Owen's Background

John P. Owen (Mr. Owen) completed the 11th grade before he entered the workforce. His early sales experience included the sale of chemicals, contractor's tools, mobile homes, manufactured housing, and cars. In 1995 Mr. Owen entered the insurance business, where he sold tax-deferred annuities, life insurance, long-term care insurance, and whole life insurance. Mr. Owen had a broker's license to sell insurance products during all times relevant to this litigation.

Laura L. Haskell Owen (Ms. Owen) completed high school and then went to school in the medical field but quit before

finishing.  She then went into the sales field for a prominent food sales organization until she met Mr. Owen in 1989.

Organization of Personal Service Corporation

In 1995 Mr. and Ms. Owen organized a wholly owned corporation called J & L Owen, Inc. (J&L Owen).  Each year Mr. Owen was elected president and Ms. Owen was elected secretary of J&L Owen.  Mr. and Ms. Owen were the sole shareholders, directors, and officers of J&L Owen.  During the relevant period J&L Owen did not have any other employees and it operated out of the Owens' home.  The Owens occasionally used J&L Owen's accounts to pay personal expenses.[5]

On their 2002 Form 1040, U.S. Individual Income Tax Return, the Owens reported $910,454 in wages from Form W-2, Wage and Tax Statement.  Specifically, Mr. Owen received a Form W-2 from J&L Owen reporting wages of $643,408; Ms. Owen received a Form W-2 from J&L Owen reporting wages of $225,000 and a Form W-2 from FFAEP reporting wages of $42,045.60.  During this period J&L Owen was on a fiscal year and a tax year ending on July 31, 2002.  J&L Owen reported as wage expense the $643,408 and $225,000 paid to

---

[5]For example J&L Owen paid $6,993.19 in fees related to the Owens' personal boat.  J&L Owen paid for the insurance on all of the Owens' six cars and two motorcycles.  When asked whether she ever used J&L Owen's accounts to pay personal expenses, Ms. Owen testified that "If I didn't have another credit card or if I didn't have my checkbook, if I had theirs at hand, yes."  Ms. Owen even used a J&L Owen check to pay her personal credit card balance of $11,907.11.

Mr. and Ms. Owen, respectively, during its tax year ending July 31, 2002.

Formation of Family First Companies

In 1997 Mr. Owen, along with his 50-percent partner, Nick Michaels (Mr. Michaels), an experienced insurance salesperson and former division manager for a different company, formed and then founded Family First Insurance Services (FFIS) and FFAEP, collectively the Family First Companies. During the years at issue FFIS was an insurance-related operation and FFAEP sold prepaid legal service policies, including estate planning services.[6] At trial Mr. Owen explained that FFIS created and offered financial products such as tax deferred annuities, long-term care insurance, and whole life insurance to its client consumers. He also explained that, in the industry, independent contractors generally sold the products and services offered by the Family First Companies.

The Family First Companies began with four individuals: Mr. and Ms. Owen, Mr. Michaels, and Christine Larson, a friend of Mr. Michaels. Within a few years the Family First Companies grew rapidly to about 150 employees and around 350 independent sales agents and achieved $20 million of gross receipts by December 31, 2001.

---

[6]Mr. Owen described the prepaid legal plan "like the insurance. * * * [Purchasers] would get a reduced fee in legal cost by joining this prepaid legal membership."

During the years at issue Mr. Owen performed services as an executive and as a sales representative and Ms. Owen was employed as an executive for the Family First Companies. It was Mr. Owen's understanding that he was entitled to be paid in two capacities: One as an officer of the Family First Companies, compensated with wages reported on Form W-2, and the other as an independent consultant who furnished services through his personal service corporation, J&L Owen. The compensation for these services was reported on a Form 1099-MISC, Miscellaneous Income, issued to Mr. Owen by J&L Owen.[7]

Sale of the Family First Companies

On June 17, 2002, Mr. Owen and Mr. Michaels sold their 50-percent ownership interests in the Family First Companies to Amerus Annuity Group Co. (Amerus). Once Mr. Owen had decided to sell his stock in the Family First Companies, he began contemplating how to minimize the tax impact of the transaction. To that effect, Mr. Owen explored different methods of deferral with his accountant Gregory Mogab (Mr. Mogab), who at that time was a partner at White, Zuckerman, Warsavely, Luna and Wolf (White Zuckerman). Mr. Mogab had a bachelor's degree in

---

[7]Respondent conducted an employment tax audit of FFIS for the tax year ending in 1998. On Apr. 29, 2002, by letter, respondent informed FFIS: "Per Revenue Ruling 58-505, when a corporate officer also sells insurance and there is no interrelation in the two capacities the commissions should be treated separately from the officer's salary."

accounting and a master's degree in taxation. He was a certified public accountant (C.P.A.) and had worked in the accounting and tax field since 1985. Mr. Owen never consulted an attorney or anyone else on this tax matter but did receive assistance with the stock sales transactions from the law firm Greenberg and Bass, LLC.

The stock purchase agreement was dated January 1, 2002, and governed the terms of the sale.[8] Mr. Owen's 50-percent share of the initial total purchase price of $7,500,000 plus interest of $82,630 for the sale of the Family First Companies was $3,832,630.21 paid in the form of a cashier's check. The Owens allocated and reported their sale proceeds in the following manner:

|  | Sale Price | Basis | Reported | Treatment |
|---|---|---|---|---|
| FFIS | $1,916,315 | $7,500 | $1,908,815 | Capital gain (taxable) |
| FFAEP | 1,916,315 | 7,500 | 1,908,815 | Sec. 1045 rollover (not taxable) |
| Total | 3,832,630 | 15,000 | [1]3,817,630 | |

[1]The amount received on June 17, 2002, from the sale of the stock was $3,832,630, minus $82,630 of interest incorrectly included in the stock sale price, for a total of $3,750,000. One-half of that, $1,875,000 minus a basis of $7,500, equaling $1,867,500 should be allocated to FFAEP. We note that the parties improperly subtracted the interest from the actual sale price of $3,750,000 before allocating half of the gain to FFAEP and consequently were using $1,826,185 as the claimed deferred amount rather than $1,867,500.

---

[8]At trial Mr. Owen explained that the agreement was dated Jan. 1, 2002, in order to calculate bonuses and pay out amounts with respect to subsequent years.

In addition to the $7,500,000 initial purchase price, the stock purchase agreement also included a "Payout Amount (as defined in Schedule 2.2)". The "Payout Amount Schedule" provided Mr. Owen and Mr. Michaels a combined additional purchase payment of $3 million per year for 5 years from 2002 through 2006 if the Family First Companies achieved 100 percent of the target operating earnings. Reduced payouts were provided for on a graduated scale if at least 70 but less than 100 percent of target earnings was achieved in any payout year. In addition, if 100 percent of the payout earnings was achieved in all 5 payout years, an additional $3 million payout bonus would be earned.

Pursuant to schedule 2.2, on January 31, 2003, Amerus paid the John & Laura Owen Family Trust $1,500,000 by wire transfer directly into the trust's account.[9] In January 2003 Mr. Owen called Mr. Mogab and informed him that the Family First Companies had met the target operating earnings and that he would be receiving an additional $1,500,000 for the sale of the Family First Companies. However, because Mr. Mogab did not yet have a 2003 tax return file for the Owens, he did not make a written record of this fact for future use.

At trial Mr. Mogab explained that by mistake the accounting firm did not report the $1,500,000 capital gain on the Owens'

---

[9]As discussed above, petitioners have conceded that this payment should have been included as capital gain income for the Owens' 2003 taxable year.

personal tax return for 2003. He explained that "A year and a half later when we prepared the '03 return honestly it was not recalled by me. There was not a 1099 issued by the company. If there were a 1099 they would have given me the 1099 and I would have had that document and it darn well would have been picked up."[10]

Mr. Owen's Postsale Compensation

Employment Agreement

The stock purchase agreement governing the sale of the Family First Companies expressly required Mr. Owen to enter into an employment agreement. Mr. Owen entered into the "EMPLOYMENT AND NONCOMPETITION AGREEMENT" (employment agreement) with FFAEP and FFIS.[11] The employment agreement, dated June 17, 2002, between Mr. Owen, as an employee, and FFAEP and FFIS, as

---

[10]The banking records relating to the $1,500,000 deposit were not presented at trial, and even after multiple requests by respondent they were never produced during the audit. We also note that $1,500,000, together with an additional $39,223, was reported as additional paid-in capital on the J&L Gems tax return for the year ending July 31, 2003, which was signed by Mr. Owen.

[11]The first page of the employment agreement, recital "A", refers to Employee, Nicky A. Michaels; however, because the first paragraph of this document states "THIS EMPLOYMENT AND NONCOMPETITION AGREEMENT ('Agreement') is entered into as of the 17th day of June, 2002, between FAMILY FIRST INSURANCE SERVICES, a California corporation, FAMILY FIRST ADVANCED ESTATE PLANNING, a California corporation (collectively, the 'Companies') and JOHN P. OWEN ('Employee')" and the document is signed by Mr. Owen, we are satisfied that this document is the contract controlling Mr. Owen's employment relationship with the Family First Companies.

employers, governed the postsale terms of Mr. Owen's employment relationship with FFAEP and FFIS.

The employment agreement included provisions for an annual salary of $625,000. It also included provisions pertaining to the nature of the employment, listing the "<u>Duties</u>. As the President of Family First Insurance Services and Vice President of Family First Advanced Estate Planning, Employee shall be responsible for the normal and customary duties associated with an executive level position."

Under the heading "Miscellaneous Provisions" the employment agreement contained provision 10.(j):

> <u>Assignment</u>. The Companies may assign all of its [sic] rights, title, interest, and obligations in, to, and under this Agreement to any corporation or partnership currently controlling, controlled by or under common control with the Companies whether by equity ownership or otherwise. The Companies may not otherwise assign the rights or obligations under this Agreement without the written consent of the Employee. Employee may not assign any of his rights or obligations under this Agreement without the written consent of the Companies.

The employment agreement in schedule B also contained provisions for management incentive bonus (MIB) payments to Mr. Owen as follows:

> 1. As bonus compensation for Employee's services during the Initial Term of Employee's Employment Agreement, Employee shall be entitled to a Management Incentive Bonus Amount based on the Companies' combined attainment of earnings goals ("Target Operating Earnings") during the Initial Term. The Management Incentive Bonus Amount for each Period, as defined in the target operating earnings schedule, during the Initial Term shall be a portion of the amount by which

the Companies' combined Earnings, as defined below, for such Period exceeds eighty percent (80%) of the Target Operating Earnings for that Period.  The term "Operating Earnings" means combined earnings of the Companies before Total Officer Compensation payable under this Schedule B and taxes computed on a basis consistent with that historically used by the Companies. * * * "Total Officer Compensation" shall mean the total compensation of the Sellers, including, but not limited to, base salary, bonuses, consulting fees, commissions, or other compensation of any kind; provided, however, that <u>commissions on life insurance and annuity products shall not be included in Total Officer Compensation</u>. [Emphasis added.]

In addition to the compensation discussed above, if the Family First Companies reached 100 percent of the target operating earnings, Mr. Owen was entitled to commissions of up to $1 million per calendar year (i.e., 2002 to 2006) under the employment agreement.

Following the closing of the stock sale on June 18, 2002, Tom Fogt (Mr. Fogt), chief financial officer for Amerus, emailed Anthony Tosatto, the general manager of the Family First Companies, requesting that he initiate a practice of forwarding the financial documentation of the Family First Companies to Mr. Fogt for review.  The financial reports show that the Family First Companies paid J&L Owen for consulting services for the year ending December 31, 2002.

Before the stock sale, Amerus was aware that the Family First Companies had paid Mr. Owen individually and J&L Owen for his services as an officer and as an independent consultant, respectively.  Amerus, informally but not in writing, acquiesced

to this compensation structure for the 2002 tax year by allowing the Family First Companies to continue to pay Mr. Owen in that manner even after the financial statements were reviewed by Mr. Fogt.  In practice this was accomplished with an addendum, dated December 27, 2002 (addendum), to the Employment and Noncompetition agreements between the Family First Companies, Mr. Owen and J&L Owen which was executed by Mr. Owen for the two Family First corporations as "CEO" of FFIS and as "Vice President" of FFAEP.

The payment matter and the December 27, 2002, addendum resulted in a dispute with Amerus as to whether Mr. Owen had authority and was authorized to sign the addendum despite his general authority as CEO and president of FFIS and as vice president of FFAEP.  The final status and outcome of this dispute was resolved in 2003 by informal actions of the parties.

In April 2003 Amerus began enforcing the salary and commission recipient payment terms of the employment agreement retroactively to January 1, 2003, when Mr. Fogt called Anthony Tosatto and instructed him that Mr. Owen was to be paid directly as an employee with wages reported on Form W-2.  At that time, J&L Owen was required to repay $133,269.22 of funds paid to it earlier in the 2003 calendar year, and those funds were recast as salary to Mr. Owen for the 2003 taxable year.

Marketing Allowance Agreement

On June 17, 2002, American Investors Life Insurance Co. (AIL), Inc. (an Amerus company), entered into a marketing allowance agreement with Mr. Owen that provided for the payment of $250,000 for consulting services over 10 quarters. The pertinent section of the marketing allowance agreement is as follows:

> This letter shall evidence the agreement by American Investors Life Insurance Company, Inc. ("AIL") providing a marketing allowance to John Owen ("Owen") and Nick Michaels ("Michaels") for consulting services in the combined amount of $500,000 payable in the manner described herein.

> AIL desires to expand the annuity marketing, recruiting, and sales efforts of Owen and Michaels in their capacities as officers of Family First Services ("FFIS"). AIL agrees to pay Twenty-five Thousand Dollars ($25,000) each to Owen and Michaels individually for ten (10) consecutive calendar quarters beginning the first quarter, 2002 and ending the second quarter, 2004.

> Payment for the first two calendar quarters of 2002 shall consist of payments of $50,000 each to Owen and Michaels individually by June 30, 2002. Thereafter, payments in the amount of $25,000 each shall by payable to Owen and Michaels within five (5) days of the first day of every calendar quarter through the second calendar quarter of 2004.

Mr. Owen's first payment under the marketing allowance agreement, in the amount of $50,000, was made payable to the order of "John P. Owen" and dated June 21, 2002. Mr. Owen then notified Amerus that he wanted future payments made payable to his corporation, J&L Owen. Afterwards, all checks issued in

connection with the marketing allowance agreement were made payable to "J & L Owen, Inc."

Addendum to Employment Agreement

As previously stated, on December 27, 2002, Mr. Owen signed the addendum in his capacity as "CEO" and president of FFIS and as "Vice President" of FFAEP.  The addendum stated that it was "limited to an expansion of the method by which Owen and his wholly-owned personal service corporation known as J and L Owen Inc. * * * [was] to be compensated under the Employment and Non-Competition Agreement."  By email dated January 22, 2003, Mr. Fogt acknowledged Mr. Owen's request for the addendum.  He indicated:  "Perhaps the employment agreements can be amended to have the services to be provided by your respective personal service companies."  But he then went on to state that the addendum "does not get the job done in my opinion.  I would suggest your tax counsel contact the AmerUs [sic] Tax Department."

Mr. Owen in his capacity as an officer of the Family First companies is the only signatory on the addendum.  According to Mr. Fogt, any changes to the employment agreement would have required approval of the Amerus board of directors.  Mr. Fogt had communicated this approval requirement to Mr. Owen sometime in the third or fourth quarter of 2002.  Further, the bylaws of both of the Family First Companies require board authorization in

determining officer compensation.  "The compensation of the officers of the Corporation shall be fixed from time to time by the Board of Directors."  The Family First Companies and the board of directors of Amerus never formally approved any of the changes the addendum would have made to the employment agreement.

Separation Agreement

Effective December 31, 2004, the "CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE" (separation agreement) "[terminated]" Mr. Owen's employment relationship with the Family First Companies.  The separation agreement explained that "the Companies [FFIS, FFAEP, Amerus, and AIL] and Employee desire to mutually terminate Employee's employment relationship with the Companies and his business relationships with AmerUs and AIL, as of December 31, 2004 (the 'Separation Date'), except as provided * * * [in the Consulting Agreement]".[12]

The separation agreement was signed my Mr. Owen as "Employee" and by Mr. Fogt for FFIS and FFAP and included an illegible signature by an "Executive VP" for Amerus and AIL.  The separation agreement contained the following provision with respect to "Cooperation and Consulting":

> 2.1 **Consulting Agreement**.  In exchange for the severance compensation set forth in Section 3 herein, Employee agrees to make himself available to the Companies during calendar year 2005 as an

[12]The record does not explain or shed any further light on the causes or motivations behind the separation agreement.

executive consultant. Employee shall function in this capacity upon reasonable notice on an "as-needed" basis (as determined in the Companies' discretion) up to a maximum of twenty (20) hours per month * * * .

Section 3 of the separation agreement provided $350,000 of consideration.  It stated that "This payment shall be made by providing Employee a check in said amount payable to J&L Owen Inc."  On March 7, 2005, Amerus paid $350,000 to the order of "J & L Owen Inc".  The payment was deposited in a J&L Owen corporate account and was included in gross income reported on J&L Owen's corporate tax return for the tax year ended on July 31, 2005.

Section 1045 Rollover

Tax Planning With Mr. Mogab

As a part of his tax planning for the FFIS and FFAEP stock sale Mr. Owen discussed various options suggested by Mr. Mogab. The Owens elected to structure their transactions in a manner they intended would defer recognition of the income received from the sale of FFAEP under section 1045.  At trial Mr. Owen explained that his understanding with regard to the requirements of the section 1045 deferral was that he "needed to open up a corporation within a 60-day period and run the business, put the money into the corporation within a certain time frame and to operate the business."  The Owens did not engage Mr. Mogab to provide a written opinion as to the section 1045 stock sale's treatment.

J & L Gems, Inc.

As part of the section 1045 deferral planning, the Owens believed that stock in a retail jewelry business would qualify as replacement stock for their Family First Companies stock for income tax deferral.  On August 12, 2002, the Owens formed J&L Gems for that purpose.  On August 14, 2002, the Owens deposited $1,916,827.07 of the proceeds of the stock sale into a J&L Gems financial account.

After Mr. Owen decided to form J&L Gems, he met with two individuals involved in the jewelry business, Michael Kazanjian (Mr. Kazanjian) and Stephen Polacheck (Mr. Polacheck).  Mr. Kazanjian is a wholesale jeweler, with inventory in excess of $5 million, who has been a family friend of the Owens' for many years.  Mr. Polacheck owns two retail jewelry stores and has been engaged in the jewelry business for more than 50 years.  On one occasion Mr. Polacheck selected about 20 pieces of jewelry that he would display on consignment for Mr. Owen.

During the meeting with Mr. Polacheck and Mr. Kazanjian, Mr. Owen made his first purchase of sixteen pieces of jewelry for a total cost of $147,026.20.  According to J&L Gems' Cost of Sales schedule for the fiscal year ending July 31, 2003, J&L Gems had six sales transactions during the period from August of 2002 July of 2003.  Of those six sales, one was to the Family First

Companies and two were to Mr. Owen's business partner, Mr. Michaels.

Tax Preparation, Assistance, and Advice

At the time Mr. Owen incorporated J&L Owen he was using the services of Robert Hall, an enrolled agent, in Glendale, California. Robert Hall prepared the Owens' individual and corporate returns before the Owens had employed the services of White Zuckerman.

The Owens also engaged the help of a bookkeeper, Sharon Marshall (Ms. Marshall), for business and personal recordkeeping. At trial Mr. Owen explained that Ms. Owen collected the receipts (both personal and business together), organized and filed them, and then handed the receipts over to Ms. Marshall for accounting and entry into Quickbooks. After Ms. Marshall recorded the information, she gave it to the accountants for tax preparation.

Once Mr. Owen realized that the stock sale of the Family First Companies would come to fruition, he felt that "it was a large transaction, and I thought we needed a little bit more experience with those kind of things. Robert really didn't handle acquisitions, and so that's when we sought after a larger firm." Mr. Owen inquired of C.P.A.s and enrolled agents and found that White Zuckerman was "a very reputable firm." William F. Wolf, a senior partner for White Zuckerman, explained that the firm performed tax planning for individual and business clients,

prepared tax returns, made presentations before the IRS, and testified as experts in litigation.  He also explained that White Zuckerman's particular tax niche was wealthy clients who required sophisticated tax advice.

Debby Britton (Ms. Britton) was the tax manager at White Zuckerman for the Owens' individual and corporate tax returns. At trial she explained that during 2002 through 2005 White Zuckerman would receive the books and records from the client or their bookkeeper, review them, make any necessary tax adjustments, and prepare the tax returns.  After a return was prepared it would be submitted to a partner for review.  Ms. Britton would make any changes requested by the partner, and the partner would sign the return.  The return would then be mailed to the client for review.  She also explained that if the return was prepared during the years that White Zuckerman began electronic filing, the return and an authorization form were mailed to the client and the client would have to sign the authorization form before White Zuckerman could file the return.

Ms. Britton believed that White Zuckerman prepared Forms W-2 for J&L Owen.  She explained that she would look at the books and records of J&L Owen and determine "what was appropriate for them as employees of the company and based on the income that the company was generating."  The Forms W-2 for J&L Owen were used as

a tool to reduce the corporate taxes J&L Owen would have had to pay.

Mr. Owen explained that once he received his tax materials from White Zuckerman he took the information seriously. Ms. Owen explained that she also looked at the returns for J&L Owen. Both Mr. and Ms. Owen signed their individual tax return for 2002. However, after that, White Zuckerman switched to efiling, and the Owens' signatures do not appear on the later individual tax returns. The Owens were mailed their completed tax return and an efile signature authorization form for the 2003 tax year. They returned the signed efile authorization on May 13, 2004.

Procedural Background

Respondent issued notices of deficiency determining the income tax deficiencies and penalties listed above. Petitioners filed timely petitions with this Court.

On January 27, 2010, the Court granted petitioners' motion for leave to file amendment to petition in which

> Petitioners contend that if the Court were to sustain Respondent's assignment of income adjustment, a substantial portion, if not all, of Petitioners' Form 1040 reported income * * * must be excluded as a duplication of the assigned income at issue since it merely passed through J & L Owen, Inc. before ultimate reporting by petitioners.

In this motion the Owens also contended that in addition to the capital gain from the stock sale of FFAEP, they were entitled to defer capital gain from the stock sale of FFIS under section

1045.[13]  A 5-day trial was held starting on March 2, 2010, in Los Angeles, California.

OPINION

## I.  Burden of Proof

The Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  However, pursuant to section 7491(a)(1), the burden of proof on a factual issue that affects the taxpayer's tax liability may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue."  The burden will shift only if the taxpayer has, inter alia, complied with substantiation requirements pursuant to the Code and "maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".  Sec. 7491(a)(2).

Petitioners did not argue that the burden should shift, and they failed to cooperate with the reasonable requests of

---

[13]As to the deferral of capital gain on the FFIS stock sale, this position was abandoned at trial, was not raised in petitioners' opening brief, and was specifically abandoned in their reply brief.  Petitioners also abandoned the position that they overreported income in the 2003 tax year, maintaining only that if the Court finds that they had assigned income during 2002 then they will have overreported their personal income for 2002.

respondent.[14]  Accordingly, the burden of proof as to the tax

deficiencies remains with petitioners.  Respondent bears the

burden of production with respect to petitioners' liability for

the section 6662(a) penalties.  Sec. 7491(c).

## II. Assignment of Income

Respondent's main theory stems from disallowance of the

Owens' assignment of income to their personal service

corporation, J&L Owen.  A fundamental principle of tax law is

that income is taxed to the person who earns it.  See Lucas v.

Earl, 281 U.S. 111, 114-115 (1930).

> "Attempts to subvert * * * [the fundamental principle
> that income is taxed to the person who earns it] by
> diverting income away from its true earner to another
> entity by means of contractual arrangements, however
> cleverly drafted, are not recognized as dispositive for
> Federal income tax purposes, regardless of whether such
> arrangements are otherwise valid under State law.
> * * *"

Residential Mgmt. Servs. Trust v. Commissioner, T.C. Memo. 2001-

297 (quoting Barmes v. Commissioner, T.C. Memo. 2001-155, affd.

89 AFTR 2d 2002-2249, 2002-1 USTC par. 50,312 (7th Cir. 2002).

Under the assignment of income doctrine, gross income from

---

[14]Petitioners failed to cooperate with respondent on multiple occasions.  The examination of Mr. and Ms. Owen's returns began in June 2005.  In November 2005 the examining agent had to fly to California to examine the Owens' tax records in the office of their tax attorney, at which time no receipts were provided to the agent.  Following this meeting the examining agent issued a formal information document request (IDR) for more documentation.  After petitioners failed to comply with the IDR, the examining agent had to issue Mr. and Ms. Owen a formal summons for documentation and testimony in August 2006.

personal services must be included in the income of the person who earned it.  Lucas v. Earl, supra at 114.  However, a more refined inquiry requires a determination of who controls the earning of the income.  Johnson v. Commissioner, 78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984).  Under Johnson two requirements must be met before a corporation, instead of the service provider, is considered the controller of the earning of the income.  First, the service provider must be an employee of the corporation who the corporation has the right to control in some meaningful sense.  Second, there must be a contract or similar indicium between the corporation and the entity using the employee's services which recognizes the corporation's control of the employee service provider.[15]  Id. at 891.

Petitioners bear the burden of proving that J&L Owen controlled the earning of the income in dispute.  See Welch v.

---

[15]We note that this Court has also applied a similar employee versus independent contractor analysis in answering the question of whether the income was properly or improperly assigned to a personal service corporation.  See Leavell v. Commissioner, 104 T.C. 140 (1995).  Under this test "The primary consideration for determining whether an individual is an employee of one organization or another is which of the two has the right to control the activities of the individual person whose status is in issue."  Leavell v. Commissioner, supra at 150 (citing Sargent v. Commissioner, 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991)).  In its analysis the Court then discussed the two requirements of the test laid out in Johnson v. Commissioner, 78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984).  Therefore, under either method the result in these consolidated cases is the same.

Helvering, supra at 115. Therefore, petitioners must present evidence "from which it might be inferred that such entity controlled petitioner's performance of consulting services." Bagley v. Commissioner, 85 T.C. 663, 676 (1985), affd. 806 F.2d 169 (8th Cir. 1986). We must "examine all the facts and circumstances in order to determine the reality of who has control over the manner and means by which the individual service provider delivers services." Leavell v. Commissioner, 104 T.C. 140, 155 (1995).

This question is important because an employee cannot serve two masters. If he is controlled by the entity receiving his services, then he cannot be controlled by his personal service corporation. However, as petitioners correctly point out, certain officers can "wear two hats" with regard to insurance corporations. An officer who sells insurance policies aside from and independent of his duties as an officer where "The company has no right to control or direct the individual in the selling activities either as to result or as to details and means by which that result is accomplished" is not an employee with respect to his selling activities. Rev. Rul. 58-505, 1958-2 C.B. 728.

Therefore, we hold that for the activities where Mr. Owen was engaged in selling independent of his position as an officer of the Family First Companies, he was an independent contractor,

and consequently, J&L Owen meets the control requirement.  See, for example, <u>Leavell v. Commissioner</u>, <u>supra</u> at 150:

> As an independent contractor, the individual service provider retains control over his activities.  This control generally includes the right to grant an intermediate entity the right to control his services.  Thus, individual persons who are independent contractors generally retain the right to choose to do business as a corporation.

Our main inquiry with respect to many of the payments Mr. Owen assigned to J&L Owen is, therefore, whether the payments were made to Mr. Owen in his capacity as an officer of the Family First Companies or in his capacity as an independent sales agent working as an independent contractor for the Family First Companies.

III. <u>Whether the Owens Failed To Include $100,000 in Income From American Investor Life for the 2002 Tax Year</u>

Under the marketing allowance agreement, AIL paid $100,000 for Mr. Owen's services during 2002.  The marketing allowance agreement explains that the payment was for "consulting services" but then explains that AIL's desire was to "expand the annuity marketing, recruiting, and sales efforts of Owen and Michaels in their capacities as <u>officers</u>."  (Emphasis added.)  This letter was signed by John P. Owen, and there is no reference to J&L Owen anywhere in the document.  At trial Mr. Owen explained that "This is another agreement to be able to promote their products. * * * It was just more money to pay us as consulting."

The first payment, of $50,000, was payable to the order of "John P. Owen". Mr. Owen deposited the check into one of J&L Owen's accounts and notified Amerus that he wanted future payments made payable to his corporation, J&L Owen. Afterwards, all checks issued in connection with the marketing allowance were made payable to "J & L Owen, Inc."

Mr. Fogt had "nothing he could offer" as to why the first check was made payable to John Owen and then the other checks were changed to J&L Owen.[16] The Owens did not include the $100,000 marketing allowance on their 2002 income tax return.

The marketing allowance was not structured as commission or as a sales incentive bonus, and Mr. Owen did not need to perform any sales or acts normally associated with commissions in order to receive the money. We find Mr. Owen's testimony limited and self-serving, and the testimony of Mr. Fogt sheds no light on the purpose for these payments. All we are left with is the written agreement, which references both Mr. Owen's services as a consultant and as an officer. We note that pursuant to section 3121(d)(1) an officer is a statutory employee for purposes of

---

[16]Petitioners emphasize the importance of the fact that Amerus acquiesced to Mr. Owen's request as to the recipient of the checks. We are not convinced that this created a contract with J&L Owen or somehow converted Mr. Owen's fiduciary duties as an officer to his duties as an independent contractor. The payments were made in this manner at the direction of Mr. Owen. Payment of money due Mr. Owen to J&L Owen at the direction of Mr. Owen in this context constitutes constructive payment to Mr. Owen, thus this argument begs the question and is not persuasive.

chapter 21 of the Code. As discussed above, petitioners had the burden of proving that these payments were made to Mr. Owen in his capacity as an independent contractor, and they have failed to meet that burden.[17] Therefore the Owens failed to include $100,000 in income from AIL for the 2002 tax year, but we conclude they should have.

IV.   Whether the Owens Overreported Their Income by $910,454 for the 2002 Tax Year

In their amended petition, filed January 27, 2010, the Owens argued that if the Court were to sustain respondent's assignment of income adjustment for 2002, they would have overreported their personal income for 2002. The Owens argue that because J&L Owen paid them a salary of $868,408 and FFAEP paid $42,045 (rounded to nearest dollar) which they included in their personal income, any of the payments made to J&L Owen that the Owens subsequently must include in their personal income would cause double counting of the same money.

---

[17]We find that the marketing allowance was paid to Mr. Owen in his capacity as an officer. The agreement does not recognize his personal service corporation even though AIL was aware of how Mr. Owen structured his employment when he owned the Family First Companies. The purpose of the marketing allowance was to incentivize Mr. Owen and Mr. Michaels "in their capacities as officers" payable "to each Owen and Michaels individually". (Emphasis added.) Finally, Mr. Owen signed the letter agreement as an individual and made no reference that he was contracting on behalf of J&L Owen, therefore failing to meet the second requirement of the Johnson test discussed above. See Johnson v. Commissioner, supra at 891.

On their 2002 individual tax return the Owens reported $910,454 in wages from Forms W-2 received from J&L Owen and FFAEP. In their opening brief, the Owens have asked the Court to disregard the Forms W-2 they were issued by J&L Owen in 2002 on the basis of Ms. Britton's testimony that the amounts reported on the Forms W-2 were not based on actual money paid to the Owens but were reported in order to claim a deduction to completely offset the income of J&L Owen so that it would not have to pay corporate income tax. Mr. Owen received a Form W-2 from J&L Owen reporting wages of $643,408 and Ms. Owen received a Form W-2 from J&L Owen reporting wages of $225,000.

Although respondent continues to assert that the Owens improperly assigned the original payments to J&L Owen in 2002, he has conceded that the Owens already reported $89,770 and $618,434 in their personal income and is no longer claiming that it must be re-included in the Owens' personal income. Therefore $160,205 remains of the Form W-2 amounts that could possibly be double counted.[18]

Generally, a taxpayer may conduct his business in whatever form he chooses and "must accept the [resulting] tax disadvantages." Higgins v. Smith, 308 U.S. 473, 477 (1940); see

---

[18]$910,454 - ($89,770 + $618,434) = $202,250. Then we subtracted the $42,045 reported on the Form W-2 issued to Ms. Owen by FFAEP because the Owens do not dispute the accuracy of the FFAEP Form W-2 and this money was never assigned to J&L Owen, leaving $160,205.

also Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148 (1974). The very testimony petitioners rely on to assert that the amounts reported on the Forms W-2 should be disregarded highlights the extensive tax planning revolving around J&L Owen. Petitioners chose to conduct their business through J&L Owen, and they chose to allow White Zuckerman to zero out the income of J&L Owen in order to avoid corporate income tax. J&L Owen's corporate tax return for the fiscal year ending July 31, 2002 (the year that J&L Owen deducted wages to Mr. and Ms. Owen of $868,408), shows gross receipts of $1,325,147 and a negative taxable income.[19] It is obvious that Mr. and Ms. Owen improperly used J&L Owen as their personal piggy bank, paying personal bills with corporate checks and the corporate credit card. It is quite possible that the Forms W-2 reflected, as income, personal expenses that the corporation could not deduct. What little evidence exists does not show that the Owens have been hoisted by their own petard.

As discussed above, petitioners bear the burden of proving that the amounts originally included on the Owens' tax return were improperly included, and the Owens have presented no

---

[19]We do note that J&L Owen operated on a fiscal year and Mr. and Ms. Owen reported their individual taxes on the calendar year. Therefore it is possible that some of the income earned by J&L Owen in its fiscal year was actually paid to the Owens in 2001. However because the Owens did not include their 2001 tax return in evidence, this Court has no way of knowing how much of the money the Family First Companies paid to J&L Owen was included in income for the prior tax year.

evidence that they did not receive this money.  Petitioners have not met their burden, and therefore we find that the Owens did not overreport their income by $910,454 for 2002.[20]

V.   Whether the Owens Failed To Include $75,000 in Income From American Investor Life for the 2003 Tax Year

Under the marketing allowance agreement, American Investor Life paid $75,000 to J&L Owen for Mr. Owen's services during 2003.  Under the same analysis discussed supra part III of this opinion, petitioners did not meet their burden of proof, and therefore we find that the Owens failed to include $75,000 in income from American Investor Life for the 2003 tax year.

VI.  Whether the Owens Failed To Include a Management Incentive Bonus of $322,375.27 From Family First Insurance Services in Income for the 2003 Tax Year

As part of Mr. Owen's employment agreement with the Family First Companies he was entitled to an MIB "based on the Companies' combined attainment of earnings goals ("Target Operating Earnings") during the Initial Term."  The MIB was to be

---

[20]We note that

"Arithmetic precision was originally and exclusively in
* * * [petitioners'] hands, and [they] had a statutory
duty to provide it...[H]aving defaulted in [their]
duty, [they] cannot frustrate the Commissioner's
reasonable attempts by compelling investigation and
recomputation under every means of income
determination.  Nor should [they] be overly chagrined
at the Tax Court's reluctance to credit every word of
[their] negative wails."

Page v. Commissioner, 58 F.3d 1342, 1348 n.6 (8th Cir. 1995)
(quoting Rowell v. Commissioner, 884 F.2d 1085, 1088 (8th Cir.
1989), affg. T.C. Memo. 1988-410), affg. T.C. Memo. 1993-398.

determined as a portion of the Family First Companies' combined earnings if the Family First Companies earned more than 80 percent of the "Target Operating Earnings." "Operating Earnings" were computed before "Total Officer Compensation", which included "base salary, bonuses, consulting fees, commissions, or other compensation of any kind; provided, however, that commissions on life insurance and annuity products shall not be included in Total Officer Compensation." For the 2003 tax year Mr. Owen earned $322,375.27 under the MIB and did not include it in his personal income, but rather he reported it as income to J&L Owen.

Mr. Owen testified that the MIB was paid "beyond" his salary and that it related to the sale of the products. He claimed that the MIB was for his consulting services. Mr. Fogt testified that the MIB was "part of the purchase price." He explained that the purchase price was inclusive of the MIB in order to make the price congruent with the possible earnings of the purchased company and to spread the price out over a number of years.

The Court notes that the MIB was included in the employment agreement, while the purchase price, including the additional payout amount, was defined in the stock purchase agreement. Schedule 2.2, titled Calculation of payout amount, attached to the stock purchase agreement, explicitly provides that "all references to 'Payout Amounts' shall be deemed part of the consideration paid by buyers to sellers for the payment of shares

purchased, and not connected in any way with compensation under Seller's Employment Agreements."[21]  Therefore we infer that because the MIB was included in the employment agreement and not the payout amounts, it was not part of the purchase price.  We now turn to whether the amount paid under the MIB was for Mr. Owen's compensation as an employee or as an independent contractor.

The Court concludes the MIB was paid to Mr. Owen in his capacity as an employee of the Family First Companies.  First, given the name of the bonus plan, the "Management Incentive Bonus", and the first line of the document which explains that "as bonus compensation for Employee's services", the document states that this payment is additional compensation for Mr. Owen's services as a manager or officer of the Family First Companies.  The clause incorporating schedule B into the employment agreement explicitly states that "The Companies shall pay to Employee the bonus compensation described in, and subject to the further terms and conditions of, Schedule B attached hereto." (Emphasis added.)  Further, this clause directly follows the clause defining the salary that the Family First Companies were required to pay Mr. Owen in his capacity as an employee.

---

[21]We note that both the schedule 2.2, payout, and the schedule B, MIB, reference the same target operating earnings but find no issue with the fact that the purchasers wanted to tie both the purchase price and officer compensation to one goal.

Although Mr. Owen testified that the MIB was for consulting fees, his testimony is self-serving and not supported by the record. See Page v. Commissioner, 58 F.3d 1342, 1346 (8th Cir. 1995), affg. T.C. Memo. 1993-398; Schneebalg v. Commissioner, T.C. Memo. 1988-563. Mr. Owen also explained that the MIB "was supposed to be above my salary, that if we hit certain targets, that I could get paid this additional money." This testimony reflects Mr. Owen's understanding that this was compensation related to his salary and payable to him as an employee if, under his management, the Family First Companies reached certain targets.

Because Mr. Owen was paid the MIB in his role as an employee of the Family First Companies and not as an independent contractor, the assignment of the MIB payment to J&L Owen fails the first prong of the Johnson control test described above, and therefore the Owens cannot assign this income to J&L Owen. See Johnson v. Commissioner, 78 T.C. 882 (1982). The Owens must include in income the MIB of $322,375.27 from Family First Insurance Services for the 2003 tax year.

VII. Whether the Owens Failed To Include Commission Income of $40,070.86 From Family First Insurance Services for the 2003 Tax Year

As part of Mr. Owen's employment agreement with the Family First Companies he was entitled to "solicit and earn commissions for the sale of life and annuity insurance products." Mr. Owen

explained at trial that he would also receive a portion of the commissions that the subagents earned. He stated: "My company, J&L Owen, Inc., had that agreement that anything they would sell my company could make a portion of. J&L Owen would make a piece of every commission." Mr. Owen also testified that in 2002 he "[believed]" he personally sold insurance policies, stating that "I did a lot of things, and I did sell. So I could have in 2002 and 2003 sold policies." By check, FFIS paid J&L Owen $40,070.86 on January 31, 2003, and the memo line stated that the check was for "2002 Commissions". At trial Mr. Tosatto, the general manager of the Family First Companies, testified that this amount was "commissions on personal business I believe that John had sold in 2002".

Although it is unclear from the record whether this payment was made to Mr. Owen for personally selling insurance policies or was a percentage of his subagents' commissions, it is clear that this payment was made to J&L Owen as commission for Mr. Owen's role as an independent contractor. As an independent contractor who furnished services through J&L Owen, Mr. Owen was entitled to assign control of his income to his personal service corporation, J&L Owen. See Leavell v. Commissioner, 104 T.C. 140 (1995). Whether Mr. Owen actually assigned that control to J&L Owen is not clear. The record is sparse as to Mr. Owen's relationship with J&L Owen. As we have previously observed, the Owens used

J&L Owen to pay personal expenses, and the Forms W-2 that J&L Owen issued to Mr. and Ms. Owen did not actually represent the amounts of money paid to the Owens. Consequently it is unclear whether the $40,070.86 commission payment made to J&L Owen passes the first requirement of the Johnson control test discussed above. See Leavell v. Commissioner, supra; Johnson v. Commissioner, supra.

Assuming arguendo that the commission payment met the first test under Johnson, it fails the second requirement. Under the second requirement of Johnson there must be a contract or similar indicium between the personal service corporation and the entity using the services which recognizes the personal service corporation's control of the employee service provider. Johnson v. Commissioner, supra.

First, we note that the employment agreement was made between Mr. Owen and the Family First Companies and does not reference J&L Owen. The addendum to the employment agreement, which attempted to change Mr. Owen's pay structure to include payments to J&L Owen, was never adopted by the board of directors of Amerus and in its view could not formally function to change the terms of the employment agreement.

Petitioners point out that "the lack of a written contract between the individual and his professional corporation is not fatal to the assertion that the professional corporation had the

right to control that individual." See <u>Idaho Ambucare Ctr., Inc. v. United States</u>, 57 F.3d 752, 755 (9th Cir. 1995) (citing <u>Pflug v. Commissioner</u>, T.C. Memo. 1989-615). However, the second prong of the <u>Johnson</u> test does not require that the individual and his professional service corporation have a written contract between them. Rather this prong contemplates that the personal service corporation and the entity hiring the independent contractor through the personal service corporation have a contract or similar indicium of the personal service corporation's right to control the individual. <u>Johnson v. Commissioner</u>, <u>supra</u> at 891. Even if this second requirement of <u>Johnson</u> could be met with evidence of a contract between the individual and the personal service corporation, as <u>Idaho Ambucare Ctr., Inc. v. United States</u>, <u>supra</u> at 755, seems to suggest, there is no mention anywhere in the record that such a contract existed between Mr. Owen and J&L Owen.

Because the assignment of the commission income of $40,070.86 to J&L Owen fails the second prong of the <u>Johnson</u> control test described above, the Owens cannot assign this income to J&L Owen. See <u>Johnson v. Commissioner</u>, <u>supra</u> at 891. The Owens must include the commission income of $40,070.86 from Family First Insurance Services for their 2003 tax year.

VIII. <u>Whether the Owens Failed To Include an Employment Termination Payment From Amerus of $350,000 in Income for the 2005 Tax Year</u>

On December 31, 2004, Mr. Owen's employment relationship with the Family First Companies was terminated under the separation agreement.  The separation agreement provided for Mr. Owen's continued consulting services in exchange for $350,000 "payable to J&L Owen Inc."  The separation agreement is very explicit in stating that the $350,000 separation payment was "In exchange" for Mr. Owen's agreeing to "make himself available to the Companies during calendar year 2005 as an executive <u>consultant</u>".  (Emphasis added.)  This payment was made to J&L Owen as a consulting fee for Mr. Owen's future role as an independent contractor advising the Family First Companies.  It is much clearer that Mr. Owen assigned control of this income to J&L Owen.  Therefore the $350,000 separation payment made to J&L Owen passes the first requirement of the <u>Johnson</u> control test discussed above.

Because the separation payment meets the first requirement under <u>Johnson</u> we must examine the assignment of the separation payment under the second requirement.  We have found that Amerus was aware of Mr. Owen's "two-hats" compensation scheme and acquiesced to it.  Further, the separation agreement specifically references J&L Owen and specifies that the consideration will be "payable to J&L Owen Inc."  There was both a significant indicium

and a contract between J&L Owen and Amerus which, as to these services, recognized J&L Owen's control over Mr. Owen. Therefore, we find that Mr. Owen's income with respect to the separation payment of $350,000 was properly received by J&L Owen and the Owens are not required to include this payment in their personal income for 2005.

IX.  Whether the Owens Are Entitled To Defer $1,867,500[22] of Capital Gain From the Sale of Their Stock in FFAEP

Under section 1045, a taxpayer, other than a corporation, may defer recognition of gain on the sale of qualified small business stock held by the taxpayer for more than 6 months.  If a taxpayer elects the application of section 1045 within the specified 60-day section 1045(a)(1) timeframe, gain from the sale shall be recognized only to the extent that the amount realized exceeds:  "(1) The cost of any qualified small business stock purchased by the taxpayer during the 60-day period beginning on the date of such sale, reduced by (2) any portion of such cost previously taken into account under this section."  Sec. 1045(a). Section 1045(b)(1) provides that the term "qualified small business stock" has the same meaning as in section 1202(c).

Section 1202(c)(2) contains an active business requirement, as defined in section 1202(e), for qualified small business stock.  Section 1202(e)(1)(A) requires that during the relevant period "at least 80 percent (by value) of the assets of such

---

[22]See supra p. 10, table note 1.

corporation are used by such corporation in the active conduct of 1 or more qualified trades or businesses".  Section 1202(e)(3)(A) defines a "qualified trade or business" as any trade or business other than

> (A) any trade or business involving the performance of services in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, consulting, athletics, financial services, brokerage services, or any trade or business where the principal asset of such trade or business is the reputation or skill of 1 or more of its employees,

Section 1202(e)(6) provides an exception to the 80 percent requirement of section 1202(e)(1), explaining that for the purposes of section 1202(e)(1)(A) any assets which

> (A) are held as part of the reasonably required working capital needs of a qualified trade or business of the corporation

> \*       \*       \*       \*       \*       \*       \*

> shall be treated as used in the active conduct of a qualified trade or business. For periods after the corporation has been in existence for at least 2 years, in no event may more than 50 percent of the assets of the corporation qualify as used in the active conduct of a qualified trade or business by reason of this paragraph.

We agree with petitioners that FFAEP was a qualified small business under section 1045 and the Owens timely made an election.  Although respondent argues that FFAEP is not qualified because one of the principal assets is the skill of Mr. Owen, the Court disagrees.  While we have no doubt that the success of the Family First Companies is properly attributable to Mr. Owen and

Mr. Michaels, the principal asset of the companies was the training and organizational structure; after all, it was the independent contractors, including Mr. Owen and Mr. Michaels in their commission sales hats, who sold the policies that earned the premiums, not Mr. Owen in his personal capacity.

Rev. Proc. 98-48, 1998-2 C.B. 367, requires that the section 1045 election be made by the due date for the filing of the income tax return for the taxable year in which the qualified small business stock was sold, and the Owens made the election on their 2002 individual income tax return.  We agree the Owens met the 60-day requirement of section 1045(a)(1) when they signed the stock purchase agreement on June 17, 2002, and then deposited $1,916,827.07 into a J&L Gems corporate account on August 14, 2002.

However, the Owens do not qualify for the section 1045 nonrecognition because J&L Gems never met the active business requirement of section 1202(c)(2).  As stated above, section 1202(e)(1)(A) requires that at least 80 percent of the assets of the new corporation be used in an active trade or business. During the first 6 months J&L Gems purchased 16 pieces of jewelry for a total cost of $147,026.20.  This is a mere 8 percent of the $1,916,827.07 deposited into J&L Gems' account from the sale of FFAEP.  According to J&L Gems' cost of sales schedule for the fiscal year ending July 31, 2003, J&L Gems had six sales

transactions during the period from August 2002 to July 2003, with gross receipts of $12,069. Of those six sales, one was to the Family First Companies and two were to Mr. Owen's business partner, Mr. Michaels.

At trial Mr. Owen attempted to justify his lack of inventory by explaining that he did not believe it was prudent to purchase more inventory without first learning the business. However, it is clear from the record that Mr. Owen simply did not follow the advice of his accountant and appears to have been unaware of or misunderstood the 80 percent active business requirement. Mr. Owen testified that

> My view of active business is just that. I went out and I purchased. I took the stock of this company and put it into the stock of this other company. I put the money from the sale of the company within the 60-day period he told me to put it in, and I started buying up gems. So in my opinion, I thought I was doing everything correctly.

It is apparent that J&L Gems was never an active business within the meaning of section 1202(e). We note that as of August 1, 2004 (about 2 years after the initial deposit), J&L Gems had 16 pieces of jewelry. Although Mr. Owen explained at trial that his goal was to develop the business and indicated that it took time for a jewelry business to become established, 2 years after the money was injected, J&L Gems was still not using it.

Petitioners contend that extensive cash on hand is an asset in active use in a trade or business. We recognize that section

1202(e)(6) apparently contemplates that even after 2 years up to 50 percent of a corporation's assets might in some circumstances be held as part of the reasonably required working capital needs of the business. But we leave for another day what amount of cash on hand can be considered actively used in a trade or business under section 1045 that has been in existence for less than 2 years. We hold that under the surrounding facts here the fact that 92 percent of J&L Gems' assets were held in cash causes it to fail the active business requirement.[23] Because J&L Gems did not meet the active business requirement during the requisite period under section 1202, the sale proceeds of FFAEP do not qualify for deferral under section 1045.

## X. Accuracy-Related Penalty

Under section 7491(c), respondent bears the burden of production with respect to petitioners' liability for the section 6662(a) penalties. This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has met the section 7491(c) burden of production with respect to the accuracy-related penalty.

---

[23]The balance of the assets were held in the form of wholesale jewelry consisting of precious metals and precious stones, a form of liquidity favored by some over currency.

Subsection (a) of section 6662 imposes an accuracy-related penalty of 20 percent of any underpayment that is attributable to causes specified in subsection (b). Respondent determined that one or both of two causes justify the imposition of the penalty for each year: A substantial understatement of income tax and negligence. See sec. 6662(b)(1) and (2).

There is a "substantial understatement" of income tax for any tax year where in the case of an individual the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the tax year or (2) $5,000. Sec. 6662(d)(1)(A). In the case of corporations (other than S corporations or personal holding companies) the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the tax year or (2) $10 million. Sec. 6662(d)(1)(B).

Section 6662(a) also imposes a penalty for negligence or disregard of rules or regulations. Under this section "negligence includes any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). Under caselaw, "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo.

1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 251 (1985) ("Reliance by a lay person on a lawyer [or an accountant] is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute."). Such reliance does not serve as an "absolute defense"; it is merely a "factor to be considered." Freytag v. Commissioner, supra at 888.

The caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and

accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also, e.g., Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), affg. 121 T.C. 89 (2003).

A fortiori, unconditional reliance on a preparer or adviser does not always, by itself, constitute reasonable reliance; the taxpayer must also exercise "Diligence and prudence".  Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991).  "The general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent."  Pritchett v. Commissioner, 63 T.C. 149, 174 (1974).  Taxpayers have a duty to read their returns to ensure that all income items are included and all claimed deductions are justified.  Reliance on a preparer with complete information regarding a taxpayer's business activities does not constitute reasonable cause if the taxpayer's cursory review of the return should have revealed errors.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662-663 (1987).  "Even if all data is furnished to the preparer, the taxpayer still has a duty to read the return and make sure all income items are

included." Magill v. Commissioner, 70 T.C. 465, 479-480 (1978),
affd. 651 F.2d 1233 (6th Cir. 1981).

Because deciding whether exceptions to the section 6662(a)
accuracy-related penalty apply is a fact-specific inquiry, we
discuss certain underpayments of tax either conceded by the Owens
or determined in accordance with this opinion, individually
below. See, e.g., Kaufman v. Commissioner, 136 T.C. 294 (2011)
(breaking up the discussion of the penalty as it pertains to each
issue); sec. 1.6664-3, Income Tax Regs. (rules and examples for
determining the total amount of penalties imposed when penalties
apply to different adjustments).

A.    $100,000 Marketing Allowance in 2002

As discussed above we found that the Owens failed to include
$100,000 in income from American Investor Life for the 2002 tax
year. Taking into account all the facts and circumstances
surrounding this payment, we find the Owens' belief that this
payment was made to Mr. Owen in his capacity as an independent
contractor to be unreasonable. The marketing allowance was not
structured as an incentive bonus, and Mr. Owen did not need to
perform any sales or acts associated with commissions to receive
it. It is therefore not reasonable that the Owens believed that
this payment was compensation to Mr. Owen in his role as an
independent contractor. Even if they relied on the past letter
from the Internal Revenue Service (IRS) and its references to

Rev. Rul. 58-505, supra, it was still unreasonable because Mr. Owen was not required to perform services associated with sales or commissions. Accordingly, the Owens are liable for the section 6662(a) accuracy-related penalty with respect to the underpayment resulting from the $100,000 marketing allowance.

B. $1,867,500 Capital Gain in 2002

Because we found that J&L Gems did not meet the active business requirement during the requisite period under section 1202, the sale proceeds of FFAEP do not qualify for deferral under section 1045 and the Owens must include the proceeds in income for 2002. The Owens argue that they are not liable for the accuracy-related penalty because they acted with reasonable cause and in good faith in relying on their accountant to structure and report this transaction.

In order for the Owens to use reliance on a tax professional to avoid liability for a section 6662(a) penalty they must show that the adviser was a competent professional, that they provided necessary and accurate information, and that they actually relied on their adviser's judgment. See Neonatology Associates, P.A. v. Commissioner, supra at 99. We agree with the Owens that they chose their accounting firm, White Zuckerman, carefully and that their adviser was a competent professional. We also agree that, with respect to the section 1045 rollover, the Owens provided the

necessary and accurate information to Mr. Mogab to accomplish tax planning.

However, we do not find that the Owens actually relied on their adviser's judgment. Mr. Owen testified that he believed that in order to meet the requirements of section 1045 he "needed to open up a corporation within a 60-day period and run the business, put the money into the corporation within a certain time frame and to operate the business." Mr. Owen then explained that it was not until the return was audited that he became aware that there was an 80-percent active business requirement under the section 1045 requirements.

The testimony of Mr. Mogab conflicts with Mr. Owen's testimony in that he stated that he advised Mr. Owen that "a certain percentage of the invested dollars had to be employed in the company. * * * And that was 80 percent and that the rollover or the reinvestment in the new business had to have been done within a certain time frame of the receipt of the proceeds from the sale." We find that the Owens failed to follow the advice of their adviser with respect to the active business requirement applicable to J&L Gems and therefore did not act reasonably with respect to this failure to include these sale proceeds in income.

We also find that the Owens did not act with good faith with respect to the section 1045 transaction. Mr. Owen explained that it was his vision to build up J&L Gems as he had the Family First

Companies; yet even as late as 2 years after the money had been deposited in the company, J&L Gems had only 16 pieces of jewelry. Mr. Owen should not in good faith have believed that deferring income tax under section 1045, by operating a business, merely involved depositing a large amount of cash in an account.  Nor could he reasonably believe that using less than 8 percent of that cash to purchase inventory and selling only a part of what little inventory he did buy to his friends and coworkers was sufficient to defer the tax.  Even under Mr. Owen's understanding of section 1045, that he had "to operate the business" in good faith and reasonably, he failed to meet that requirement. Accordingly, the Owens are liable for the section 6662(a) accuracy-related penalty with respect to the underpayment relating to sale proceeds of FFAEP.

C.   $75,000 Marketing Allowance in 2003

The Owens failed to include $75,000 in income from American Investor Life for the 2003 tax year.  As early as the third or fourth quarter of 2002, Mr. Fogt advised the Owens that the assignment of income to J&L Owen may not have been proper.  At this time Mr. Owen had at least been warned that it would be unlikely that he would be permitted to indefinitely bifurcate his compensation from the Family First Companies.  He was certainly aware of this fact, as to the 2003 payments, by April 2003 when J&L Owen was required to return $133,269.22 received in the

beginning of the 2003 calendar year so that the money could be paid to Mr. Owen as wage income.  At this time Mr. Owen knew that he would not receive any of the compensation related to his salary as consulting fees paid to J&L Owen.  He had clearly been put on notice that this income was to be included in his personal income, and therefore we do not find that the Owens acted in good faith or with reasonable cause in 2003.  They are liable for the section 6662(a) accuracy-related penalty as applicable to the underpayment relating to the $75,000 paid in 2003.

D.    $40,070.86 Commission Income in 2003

The assignment of the commission income of $40,070.86 to J&L Owen failed the second prong of the Johnson control test.  Consequently, the Owens could not assign this income to J&L Owen and must include it in their 2003 taxable income.  The Owens are not excused under section 6664(c)(1) with respect to the section 6662(a) accuracy-related penalty.  They did not act with reasonable cause or good faith with respect to this income because they ignored the lack of a contract or other indicia of J&L Owen's right to control the personal services of Mr. Owen.

E.    $322,375.27 Management Incentive Bonus in 2003

Because we found that Mr. Owen was paid the MIB in his role as an employee, the Owens must include in income the Management Incentive Bonus of $322,375.27 from Family First Insurance Services for the 2003 tax year.  We again find that the Owens are

not excused under section 6664(c)(1) with respect to the section 6662(a) accuracy-related penalty because they did not act with reasonable cause or good faith with respect to this income. As discussed above the Owens had been put on clear notice that Mr. Owen's compensation could not be bifurcated and that he was to include his compensation in his personal income. The Owens' causing J&L Owen to return the $133,269.22 clearly indicates that they knew and had acquiesced in the ultimate resolution of this related issue.

F.   $1,500,000 Capital Gain in 2003

The Owens argue that they are not liable for the section 6662(a) penalty because they relied on White Zuckerman's staff to accurately prepare their return. We conclude that the Owens did not rely in good faith on their accountants' advice because their reporting of this payment was oral and was long before the return was prepared. Further, they did not carefully examine their return before it was submitted to the IRS, and this standing alone, given the material amount involved, would trigger the penalty under these facts. See Woodsum v. Commissioner, 136 T.C. 584, 595 (2011) ("In signing the return thus erroneously prepared, petitioners were not deliberately following substantive professional advice; they were instead unwittingly (they contend) perpetuating a clerical mistake. The defense of reliance on professional advice has no application here."); Neonatology

<u>Associates, P.A. v. Commissioner</u>, 115 T.C. at 99.  Although the Owens attempted to convince the Court at trial that they were simply unsophisticated taxpayers at the mercy of their accountants, we find this extremely hard to accept given that Mr. Owen with Mr. Michaels built a company from four people into one that garnered over $7,500,000 when it was sold.  A cursory glance at the return would have shown that the amount reported was less than half of the amount required.

As a result the Owens failed to ensure that all of their income items, particularly their taxable capital gains, were included on the return.  See <u>Metra Chem Corp. v. Commissioner</u>, 88 T.C. at 662-663; <u>Magill v. Commissioner</u>, 70 T.C. at 479-480.  The Owens' unconditional reliance on their accountants does not, on these facts, constitute reasonable good-faith reliance and does not excuse their failure to closely examine their return.  The Owens' reliance defense is also undercut by the fact that they did not provide Mr. Mogab with the necessary written documentation regarding the additional income from the sale of the Family First Companies.  See <u>Neonatology Associates, P.A. v. Commissioner</u>, <u>supra</u> at 99 (second prong).  The Owens have not demonstrated good faith and reasonable cause for their underpayment.  Accordingly, they are liable for the section 6662(a) accuracy-related penalty on the underpayment relating to the $1,500,000 adjustment.  The Owens are also liable for any

penalties related to their concessions that have not been specifically discussed. See sec. 6662(a) and (b)(1) and (2).

The Court has considered all of petitioners' and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decisions will be entered under Rule 155.